**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

U.S. DISTRICT COURT SOUTHERN DISTRICT OF GEORGIA
AUG 26 2026
FILED

**NIKKI M. HARPER,**
Plaintiff,

v. Civil Action No. 1:25-CV-00203-JRH-BKE

**BARRETT FINANCIAL GROUP, LLC; TINA THORNTON; UNITED WHOLESALE MORTGAGE; MR. COOPER LOANS / NATIONSTAR MORTGAGE; LAKEVIEW LOAN SERVICING; MARY YELTON REALTY, LLC d/b/a BOSWELL REALTY; MAX BOSWELL; ANNE MARIE KYZER; VANDERMORGAN REALTY; JUSTIN BOLIN; FINDLAY, EDENFIELD & GREEN, LLC; MARK GREEN; DANIELLE NEEF; ALL STAR HOME INSPECTIONS, LLC; CHUCK TOLBERT; KRIS HARDY d/b/a HARDY APPRAISALS; STEVEN SIKES; and KATHERINE NIX FRENCH,**
Defendants.

---

## SECOND AMENDED COMPLAINT

## I. INTRODUCTION

1. Plaintiff Nikki M. Harper ("Plaintiff" or "Ms. Harper"), a disabled United States Army veteran with 100% service-connected Post-Traumatic Stress Disorder, files this Second Amended Complaint pursuant to the Court's Order of August 14, 2026 (Doc. 145) granting leave to amend, and in compliance with the Court's direction to provide detailed, specific factual allegations organized by Defendant and by claim, including the who, what, when, where, and how of each Defendant's role in the conduct at issue.

2. This action arises from a coordinated scheme surrounding Plaintiff's VA-backed purchase of 115 Carolyn Street, Sardis, Georgia 30456 (the "Property"), which closed on or about January 9, 2024. The scheme spanned mortgage origination, table-funding,

appraisal, home inspection, real estate brokerage, and closing services, and continued after closing through loan servicing, credit reporting, and the ongoing collection on a fraudulently originated loan.

3. Plaintiff, a first-time homebuyer using her VA home-loan benefit for the first time, was induced to close on a defective and unaffordable property through: (a) inflation of her income to manufacture loan eligibility she did not possess; (b) concealment of the true lender by naming a mortgage broker as "Lender" on federally required disclosures; (c) origination of the loan by an individual not licensed to originate mortgage loans in Georgia; (d) misclassification of Plaintiff's VA loan as an FHA loan, stripping her of the mandatory VA escape clause; (e) an appraisal ordered and paid for by the broker, in violation of appraisal independence, that returned a value precisely matching the loan amount; (f) a home inspection performed by an inspector financially affiliated with the selling agents that failed to disclose severe defects; (g) fabrication of Plaintiff's electronic signature on documents she never signed; (h) production of materially inconsistent, altered contract versions; (i) concealment of Plaintiff's own transaction documents for approximately one year; and (j) continued collection on the fraud-tainted loan during this litigation.

4. Plaintiff was steered away from two legitimate financing sources -- Veterans United Home Loans, the nation's leading VA home-purchase lender, which had pre-approved her, and Plaintiff's own credit union -- and onto the Defendants' chosen originator. She was a resident of North Carolina throughout the origination and closing, and the fraudulent documents were transmitted across state lines to her to be signed.

5. Every Defendant knew that this was a VA loan and that Plaintiff was a disabled veteran using her VA benefit and VA disability income. Mr. Cooper's own Mortgage Fraud Investigator, Kimberly Keeton, reviewed the transaction and documented in writing on September 10, 2024, that Plaintiff appeared to have a credible case for collusion involving the parties to the transaction, and forwarded those findings to Lakeview, UWM, and the VA. Despite this internal finding, the servicing Defendants

continued to collect on the loan, scheduled and then abandoned a foreclosure sale, and defended this action.

## II. PARTIES

6. Plaintiff Nikki M. Harper is a disabled United States Army veteran with 100% service-connected Post-Traumatic Stress Disorder, and a full-time senior psychology student, residing at 1529 Pinebrook Court, Apartment 2, Greenville, North Carolina 27858. At all relevant times during the origination and closing of the transaction at issue, Plaintiff resided in and leased a home at 103 Chelsea Drive, Snow Hill, North Carolina 28580. At all relevant times, Plaintiff was a VA-eligible first-time homebuyer acting in reliance on Defendants' representations, disclosures, and professional and legal obligations.

### A. The Lender and Mortgage Defendants

7. Defendant Barrett Financial Group, LLC ("Barrett Financial") is an Arizona limited liability company operating as a mortgage broker, with offices at 275 E. Rivulon Blvd., Suite 200, Gilbert, Arizona 85297. Barrett Financial brokered and was named as "Lender" on Plaintiff's loan. Trevor Barrett is the owner and chief executive of Barrett Financial; although not served individually, his conduct as owner and as the named loan officer on Plaintiff's Closing Disclosure is pleaded herein and attributed to Barrett Financial.

8. Defendant Tina Thornton (NMLS #1248462) was, at all relevant times, the individual who actually originated Plaintiff's loan and served as Plaintiff's sole point of contact throughout origination. Thornton was not licensed to originate mortgage loans in the State of Georgia at the time of Plaintiff's loan.

9. Defendant United Wholesale Mortgage ("UWM") is a mortgage lender headquartered at 585 South Boulevard E, Pontiac, Michigan 48341. UWM performed the underwriting

of Plaintiff's loan and was the actual table-funding lender, though its role was concealed on the closing documents, which instead named Barrett Financial as "Lender."

10. Defendant Mr. Cooper Loans / Nationstar Mortgage ("Mr. Cooper" or "Nationstar") is a mortgage servicer that also does business as Champion Mortgage, and which, by merger effective February 2, 2026, became Rocket Mortgage, LLC, its successor-in-interest. Mr. Cooper acquired servicing of Plaintiff's loan and has continued to collect on it.

11. Defendant Lakeview Loan Servicing ("Lakeview") is the investor/owner in the servicing chain of Plaintiff's loan and received the fraud findings of Mr. Cooper's investigator.

**B. The Real Estate Brokerage Defendants**

12. Defendant Mary Yelton Realty, LLC, d/b/a Boswell Realty is a Georgia real estate brokerage. Mary Yelton Realty, LLC (Control No. 0570639) was administratively dissolved by the Georgia Secretary of State on August 26, 2019, yet has continued to conduct real estate business -- including Plaintiff's transaction -- under that dissolved name. The active successor entity, Boswell Realty, LLC (Control No. 19072418), was formed May 20, 2019, and shares the same principal office (310 Liberty Street, Waynesboro, Georgia 30830) and the same owner/broker. This brokerage served as the listing/seller's brokerage in Plaintiff's transaction.

13. Defendant Max Boswell is the owner and broker of Mary Yelton Realty, LLC d/b/a Boswell Realty, and is the registered agent of Boswell Realty, LLC. Because he conducted business under a dissolved entity, Boswell is individually liable for the conduct alleged herein.

14. Defendant Anne Marie Kyzer (License #421441) was the listing/seller's agent in Plaintiff's transaction, operating under the dissolved Mary Yelton Realty brand and out of its 310 Liberty Street office.

15. Defendant VanderMorgan Realty is a Georgia real estate brokerage that served as the buyer-side brokerage in Plaintiff's transaction. Christina Schroder was the VanderMorgan agent who acted as Plaintiff's buyer's agent; although not served individually, Schroder's conduct is pleaded herein and attributed to VanderMorgan.

16. Defendant Justin Bolin is the owner/broker of VanderMorgan Realty, responsible for the supervision of its agents including Christina Schroder. Bolin's name appears on the transaction documents, and Bolin engaged the closing law firm. At relevant times Bolin also served on a real estate board with which Plaintiff filed a complaint concerning the matters alleged herein; Plaintiff retains the related text messages.

**C. The Closing Defendants**

17. Defendant Findlay, Edenfield & Green, LLC is a Georgia law firm that served as the closing attorney/settlement agent for Plaintiff's transaction.

18. Defendant Mark Green is an attorney and notary with Findlay, Edenfield & Green, LLC who conducted Plaintiff's closing and notarized the closing instruments.

19. Defendant Danielle Neef is a closer with Findlay, Edenfield & Green, LLC who signed Plaintiff's security deed as an "unofficial witness."

**D. The Inspection and Appraisal Defendants**

20. Defendant All Star Home Inspections, LLC is a Georgia home-inspection company that performed the inspection of the Property. Dwayne Higdon was the inspector who performed the inspection; although not served individually, Higdon's conduct is pleaded herein and attributed to All Star Home Inspections.

21. Defendant Chuck Tolbert is the owner of All Star Home Inspections, LLC, and is an affiliate member, past Affiliate of the Month, and frequent event sponsor of the REALTORS of Greater Augusta.

22. Defendant Kris Hardy, d/b/a Hardy Appraisals (Hardy Appraisal Co.), is a Georgia-licensed appraiser (License #2607) who performed the appraisal of the Property.

23. Defendant Steven Sikes performed repair and other work on the Property in connection with the transaction and generated documentation representing that required repairs were completed.

**E. The Seller**

24. Defendant Katherine Nix French, a/k/a Kathryn A. Nix, was the seller of the Property.

## III. JURISDICTION AND VENUE

25. This Court has subject-matter jurisdiction under 28 U.S.C. Section 1331 (federal question) because this action arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sections 1961-1968; the Truth in Lending Act (TILA), 15 U.S.C. Section 1601 et seq.; the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. Section 2601 et seq.; the Fair Credit Reporting Act (FCRA), 15 U.S.C. Section 1681 et seq.; and the Fair Housing Act (FHA), 42 U.S.C. Section 3601 et seq., including its provisions prohibiting disability discrimination.

26. This Court has supplemental jurisdiction under 28 U.S.C. Section 1367 over Plaintiff's related state-law claims, including fraud, fraudulent concealment, negligent misrepresentation, negligence, breach of contract, breach of fiduciary duty, legal

malpractice, and civil conspiracy, because those claims arise from the same case or controversy.

27. This Court also has jurisdiction under 18 U.S.C. Section 1964(c), which authorizes a private right of action for any person injured in her business or property by reason of a violation of RICO, and provides for the recovery of treble damages and costs.

28. Venue is proper in this District under 28 U.S.C. Section 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and because the Property -- 115 Carolyn Street, Sardis, Burke County, Georgia 30456 -- is located within the Southern District of Georgia, Augusta Division.

29. At all times relevant to the origination and closing of the loan and the generation of the transaction documents, Plaintiff was a resident of and leasing a home at 103 Chelsea Drive, Snow Hill, North Carolina 28580, and did not take occupancy of the Property until the second week of February 2024, after her North Carolina lease ended on February 3, 2024. Defendants directed their conduct, communications, and documents to Plaintiff both in Georgia and in North Carolina.

## IV. STATEMENT OF FACTS

### A. Plaintiff, Her Housing, and Her VA Benefit

30. Plaintiff Nikki M. Harper is a disabled United States Army veteran with 100% service-connected PTSD. At all relevant times during the origination and closing of the transaction at issue, Plaintiff resided in and leased a home at 103 Chelsea Drive, Snow Hill, North Carolina 28580. She was securely housed, paying $925 per month in rent. She was not seeking to buy out of financial desperation; rather, as a 48-year-old veteran, she sought to use her earned VA home-loan benefit, for the first time, to stop renting and to build long-term stability and equity of her own. Plaintiff banks with a credit union and had financed her other obligations through that credit union.

**B. First Contact – Plaintiff Identifies Herself as a Disabled Veteran and First-Time Buyer**

31. In early November 2023, Plaintiff inquired about a property known as the Bennock Mill Road home – a manufactured/mobile home – that she had seen listed on Zillow.com. Her initial message identified exactly who she was: "Hi I'm a veteran who is very interested in this property. Do you all deal with Va loans? I would be a first time buyer."

32. On November 9, 2023, Christina Schroder, then an agent with Defendant VanderMorgan Realty, responded to Plaintiff's inquiry. It was through Schroder's response that Plaintiff came into contact with VanderMorgan Realty. From this first contact, Schroder and VanderMorgan knew Plaintiff was a disabled veteran, a first-time buyer, and a VA-loan borrower residing in North Carolina.

33. On November 11, 2023, Plaintiff – writing from North Carolina – asked to schedule a viewing and to ask questions, and noted "I'm currently in North Carolina." On November 13, 2023, a viewing was confirmed for the next day, and on November 14, 2023, Plaintiff drove from North Carolina to view the property in person, accompanied by her partner, Gordon Ellison.

**C. Plaintiff Was Approved Through Legitimate VA Lenders on Her Own**

34. Plaintiff was pre-approved through Veterans United Home Loans – the nation's leading VA home-purchase lender – for $165,000. Her Veterans United loan officer was Lucas Hassemer. Veterans United also paired Plaintiff, free of charge and through its affiliated Veterans United Realty, with a VA-experienced real estate agent, Chad Trollinger, whose role was to advocate for Plaintiff's best interests and ensure any home met VA requirements, along with a home-buying concierge, Brittany Lucy.

35. As of November 28, 2023, Veterans United re-approved Plaintiff for $165,000 with no co-signer, based on Plaintiff's own income. Plaintiff was prepared to purchase a

home within that legitimate approval amount, and told Schroder she did not want anyone to have to co-sign for her.

**D. The Steering -- Schroder Moves Plaintiff Off Veterans United and Onto Tina Thornton**

36. Rather than allowing Plaintiff to proceed with her legitimate Veterans United approval, Schroder disparaged Veterans United and steered Plaintiff to a mortgage originator of Schroder's choosing. On November 28, 2023, Schroder wrote to Plaintiff: "I was just speaking to a very good friend of mine who is a VA magician in the lending field. She would love to take a second look at your case for you. She has been able to do things for my VA buyers that Veteran's United has not. Her name is Tina Thornton. Can I have her give you a call?"

37. Schroder's stated purpose in switching Plaintiff to Thornton was to obtain a higher approval amount than Plaintiff's legitimate Veterans United approval. Schroder wrote that "in speaking to Tina she thinks she may be able to get a high approval amount," and, regarding the manufactured home, "we need to switch to Tina asap."

38. Both Schroder and Thornton disparaged Veterans United to Plaintiff, characterizing the nation's leading VA lender as merely "a call center of people taking calls" who "didn't care about people," in order to move Plaintiff off her legitimate approval. No Defendant ever suggested that Plaintiff finance the home through her own credit union, where she banked and had financed her other obligations. A significant reason Plaintiff trusted Thornton and did not return to her Veterans United loan officer was that Thornton represents herself as a veteran -- a fact stated across Thornton's professional profiles -- which led Plaintiff, a fellow veteran, to place confidence in her.

39. Plaintiff's legitimate lender attempted to retain her. On December 13, 2023, Plaintiff's Veterans United loan officer, Lucas Hassemer, texted: "Can I ask why you've decided to go with another lender? Have you found a home and are under contract to purchase it?" When Plaintiff confirmed she had, Hassemer offered: "Would you like to compare what the other company is offering versus what we would be able to offer to

make sure you're getting the best deal possible?" Plaintiff, relying on what she had been told by Schroder and Thornton, declined. On December 18, 2023, Hassemer reached out once more, offering again to compare Veterans United's terms "versus the other lender," noting "a lower interest rate can save you quite a bit of money." Plaintiff had by then already been steered onto Thornton, Barrett Financial, and UWM.

**E. Plaintiff Did Not Qualify on Her Own True Income**

40. During the same period, Plaintiff pursued financing for the affordable Bennock Mill manufactured home through First Choice Mortgage and its loan officer, Dirk Merrit. On her true income, Plaintiff did not qualify. In a text exchange with Schroder on November 15, 2023, Plaintiff acknowledged that her income-to-debt ratio was "a bit too high," and Schroder confirmed, "Yes ma'am unfortunately." Schroder explained that Plaintiff was "over the 45% mark" and would need a co-signer under 40% to "balance the percentage."

41. On or about November 15, 2023, a Statement of Credit Denial (Loan No. 20233199, $160,000, 7.250%, 30-year term) was issued, stating the loan "was denied due -- unable to get AUS approval," and listing as reasons "Income insufficient for amount of credit requested" and "Excessive Obligations in Relation to Income." On her true income, Plaintiff could not qualify.

42. Plaintiff attempted to qualify honestly. She first pursued a co-signer, her partner Gordon Ellison; when that fell through, she considered asking her mother to co-sign. On November 26, 2023, Plaintiff told Schroder in writing: "I know my income to debt ratio was over where it needed to be at this point I may need to retract my application." Plaintiff was prepared to walk away rather than proceed dishonestly, telling Schroder she would "just wait until my time."

**F. The Switch From the Affordable Home to 115 Carolyn Street**

43. Plaintiff sought an affordable property. When Schroder's listings in Plaintiff's legitimate price range were, in Plaintiff's assessment, in poor condition or undesirable areas, Plaintiff stated she would rather wait six months and pay down a debt than "settle for a place I'm going to call home." Plaintiff repeatedly expressed a desire not to rush: "I don't want to rush doing this..this is a major step. If it sells so be it."

44. The transaction was nonetheless redirected to 115 Carolyn Street, Sardis, Georgia 30456, a site-built home listed above Plaintiff's legitimate Veterans United approval. Plaintiff, exercising prudence, asked Schroder whether it "would make more sense to wait and see how much I get approved for" through Thornton before proceeding. Rather than waiting, Plaintiff was pressed to act: on December 5, 2023, Schroder sent an offer "for signatures," stating "The other agent is waiting for it," and Plaintiff signed and, on December 6-7, 2023, wired $500 in earnest money -- before ever seeing the Property in person.

### G. Plaintiff Disclosed Her PTSD and Repeatedly Sought to Slow Down; Defendants Applied Pressure

45. Throughout this period, Plaintiff disclosed her disability and asked to slow the pace. On November 28, 2023, Plaintiff told Schroder the process was "stressing me right now" and that she was "just going to slow down and take my time," adding that it "doesn't help that I have PTSD." Schroder nonetheless repeatedly pressed urgency, telling Plaintiff on multiple occasions that she "would have to offer today" and that they "have to move quickly."

### H. Plaintiff's Documented Inability to Afford the Transaction

46. Plaintiff repeatedly and contemporaneously stated that she could not afford the costs of the transaction. She told Schroder she was "embarrassed to say I don't have the funds to complete the packet from Tina," that her "funds and options are running out," that she was "now borrowing money to get these things done and it's looking like I can't afford it," and, as to the septic, that she was "unable to get that septic done..my funds are depleted..I know I need it, simply can't afford it." Rather than protect Plaintiff,

Schroder responded by stating she would remove the septic requirement -- a requirement the Defendants had placed in the contract -- from the contract. Plaintiff neither drafted the contract nor had authority to alter it.

**I. The Origination -- Thornton, Barrett Financial, and the Concealed Lender UWM**

47. Plaintiff's loan was originated through Defendant Barrett Financial Group, LLC. Throughout origination, Plaintiff's sole point of contact was Defendant Tina Thornton, who provided her contact information as (775) 815-1981 and TinaT@BarrettFinancial.com. Thornton took Plaintiff's application, collected her income documentation, obtained her Certificate of Eligibility, and handled every aspect of the loan. On December 5, 2023, Barrett Financial issued a Pre-Approval Letter for a VA loan (Purchase Price $160,000; Loan Amount $160,000), signed by "Tina Thornton, NMLS #1248462, Mortgage Advisor, Barrett Financial Group."

48. At the time she originated Plaintiff's Georgia loan, Thornton was not licensed to originate mortgage loans in the State of Georgia. Public NMLS licensing records establishing this fact were previously filed by Plaintiff as supplemental evidence in this action.

49. On December 11, 2023, "Chris Cooper," writing on Barrett Financial letterhead and copying Trevor Barrett and Tina Thornton, emailed Plaintiff: "My name is Chris Cooper, I am working with your Loan Officer, Tina Thornton," and advised that Plaintiff "will be receiving initial loan disclosures from UWM." Defendant United Wholesale Mortgage performed the underwriting and was the actual table-funding lender -- a fact UWM later admitted in its July 15, 2026 CFPB response: "UWM performed the underwriting review of your loan application." Notwithstanding UWM's role as the true lender, the closing documents named Barrett Financial -- a broker -- as "Lender." After closing, mail from UWM accumulated at the Property while Plaintiff's own paperwork named Barrett as "Lender," causing Plaintiff confusion as to who held her loan.

**J. The Income Inflation**

50. Plaintiff's actual monthly income was her VA disability income of approximately $3,595.95 when the transaction began, increasing to approximately $3,737.85 by operation of the standard annual VA cost-of-living adjustment (which, given how VA benefits are paid, is reflected in the payment issued at the end of December for the month of January). Plaintiff's true income is established by official Department of Veterans Affairs records and by her bank statements, and was never over approximately $3,737.85 at the relevant time. Because Plaintiff's true income would not have qualified her for the loan, the Defendants both inflated her income and rushed the transaction -- pressing documents on her for signature from early December 2023 through closing -- so that the manufactured figures would not be scrutinized before the loan was forced through.

51. The loan file, however, reflected a "Verified Income" of $4,527.50, as shown on UWM's own Loan Approval Conditions for loan number 1523172699 -- inflating Plaintiff's income by approximately $790 to $930 per month. The loan file also misrepresented Plaintiff's VA disability income as paid biweekly, when VA disability is paid monthly.

52. The income inflation manufactured eligibility Plaintiff did not possess. Weeks earlier, on her true income, Plaintiff had been over 45% debt-to-income and had been denied. The Barrett/UWM Loan Approval Conditions, by contrast, reflected housing/debt ratios of 33.72%/50.82% based on the inflated $4,527.50 income figure. Plaintiff -- who had told Schroder in writing that she could not qualify and might retract her application, and who had no co-signer -- ultimately closed alone, a result possible only because her income had been inflated.

**K. The FHA Misclassification and the Stripped VA Escape Clause**

53. Plaintiff's loan was a VA loan. The Barrett Financial Pre-Approval Letter (Dec. 5, 2023) states "Loan Program: VA." Nonetheless, on December 22, 2023, Thornton sent an email -- copying an insurance contact and Adrian Loera at UWM -- treating and describing Plaintiff's loan as an FHA loan, asking how to proceed "because it's FHA."

54. Consistent with that misclassification, Plaintiff's file contains an "FHA Disclosures / Amendatory Clause / Real Estate Certification" (Loan No. 1523172699), dated December 11, 2023, for the Property at the $160,000 figure -- the wrong loan-type disclosure for a VA loan. The presence of the FHA Amendatory Clause, in place of the mandatory VA escape clause, deprived Plaintiff of the protection guaranteed to VA borrowers under 38 C.F.R. Section 36.4303 -- the right to walk away without penalty if the VA-appraised value comes in below the purchase price.

55. The Real Estate Certification portion of that FHA document -- which certifies that "there are no amendments or counterletters... and the sales contract is the only agreement between the buyer and seller" -- was signed by Anne Marie Kyzer as real estate agent on December 27, 2023, and by the seller, Katherine Nix French, on December 28, 2023. Christina Schroder's signature also appears on the document. That certification was false: the transaction involved additional and altered documents, as set forth below. As with other instruments in this transaction, the electronic signatures on this document -- including Plaintiff's and Schroder's -- are faint and barely legible.

**L. The Appraisal -- Broker-Ordered, Broker-Paid, and Pre-Set to the Loan Amount**

56. On a VA purchase loan, the appraiser is to be assigned through the VA's process to preserve appraisal independence, so that the parties who profit from the loan do not control the valuation. Here, that independence was defeated. The appraisal was performed by Defendant Kris Hardy d/b/a Hardy Appraisals.

57. Hardy's own invoice (Invoice No. 762-23, dated December 17, 2023), filed in this action by Hardy himself, establishes that Hardy's client was Barrett Financial Group, LLC/VA, that Barrett Financial was billed the $650 appraisal fee, and that the fee was PAID by check no. 20041 dated January 12, 2024. Hardy's appraisal report and transmittal letter likewise identify Barrett Financial as the "Lender/Client" and state the appraisal was performed "in accordance with your request" -- Barrett's. In short, the broker that profited from the loan both ordered and paid for the appraisal.

58. UWM, by contrast, represented to the CFPB that "the appraisal order was assigned to Mr. Hardy by the VA Regional Loan Center in Atlanta." That representation is contradicted by Hardy's own filed invoice and report showing Barrett Financial as the ordering and paying client. UWM's statement to a federal regulator was therefore false.

59. The appraisal returned a value of exactly $160,000 -- precisely matching the loan amount -- as of an effective date of December 16, 2023. This occurred even though the Property had recently been listed at $165,000, reduced to $159,000 on November 28, 2023, and reduced again to $150,000 on December 4, 2023 -- such that the $160,000 contract price exceeded the Property's most recent list price. Hardy's report further certified there were "no physical deficiencies or adverse conditions" and described the condition as "C4; No updates in the prior 15 years," despite the mold, capped fireplace, electrical fire-hazard, and other defects described below. Hardy's report also described the fireplace as "Gas, propane, vented," when in fact the fireplace was a wood fireplace that had been capped and rendered unusable.

60. When Plaintiff later requested a copy of her own appraisal from Hardy, Hardy refused. Hardy returned Plaintiff's initial voicemail, but upon Plaintiff identifying herself, stated he had the "wrong number"; when Plaintiff called back and identified herself as the person who had left the voicemail he had just returned, Hardy declined to provide the appraisal, citing "an ongoing lawsuit." The appraisal was not in Plaintiff's closing package and was not in the closing attorney's file.

**M. The Fabricated Electronic Signatures**

61. Plaintiff's electronic signature was placed on documents she never signed. Plaintiff resided in North Carolina, in the Eastern Time Zone, throughout the relevant period. Yet the "FHA Disclosures / Amendatory Clause / Real Estate Certification" bearing Plaintiff's purported signature is time-stamped "12/11/23 01:53:36 PM PST" -- Pacific Standard Time -- the time zone of Barrett Financial's operation, not Plaintiff's. The signature is faded and image-like, unlike Plaintiff's genuine signatures, and unlike the other parties on the same document, there is no DocuSign or AuthentiSign signer identification

associated with Plaintiff's signature, while the seller and Kyzer each bear DocuSign identifiers.

62. Plaintiff's fabricated signature appears on multiple documents she never signed, including: (a) the FHA Amendatory Clause/Real Estate Certification; (b) an amendment to the purchase contract concerning the fireplace, described below; and (c) a prior Warranty Deed conveying the Property from a previous owner to the seller, Kathryn A. Nix, recorded in 2016 -- a transaction that predated Plaintiff's involvement entirely and on which Plaintiff's signature has no legitimate reason to appear. That prior deed is recorded in Burke County at Book 978, Pages 235-236 (recorded March 7, 2016), conveying the Property between prior parties (Flake/Dixon to Nix); Plaintiff was never a party to it, yet Plaintiff's electronic-signature block and envelope identifiers appear on the copy in Plaintiff's closing file. Further, on the December 13, 2023 amendment concerning the fireplace, Plaintiff's purported signature bears no e-signature platform capture identifier, while every other party's signature on the same page (the seller's and the seller's agent's) bears a DocuSign capture identifier -- a forensic inconsistency indicating Plaintiff's signature was applied differently from, and outside, the platform that captured the other parties' signatures. Plaintiff strongly does not recall executing the reproduced version of Amendment #1 -- the version bearing the struck-through, "X"-marked fireplace-inspection requirement -- which carries Plaintiff's purported initials and electronic signature as a fuzzy, pixelated photocopy image. Plaintiff did not knowingly execute that version and did not authorize the application of her initials or signature to it.

63. The same fabricated, pixelated signature image appears across these documents. On or about August 9, 2024, Plaintiff reported to the Burke County Sheriff's Office (Case No. 202447320) that alterations had been made using a copy of her electronic signature without her consent, naming Mary Yelton Realty, Max Boswell, and Anne Marie Kyzer. The identity of the person or persons who applied Plaintiff's signature to documents she never signed is establishable through the DocuSign, AuthentiSign, and DocMagic audit trails (which record the IP address, device, timestamp, and account for each signature) and is properly the subject of discovery.

### N. The Property Was Staged to Appear Renovated While Its Systems Were Defective

64. The Property, built circa 1958, had been vacant for approximately five months and was not maintained. The seller, Katherine Nix French, did not reside there; she lived elsewhere. The Property had been cosmetically dressed to appear renovated while its major systems were defective, non-functional, or hazardous -- a condition Plaintiff discovered only after moving in. The full condition of the Property is further documented in the home inspection report, photographs, and the Tower Hill inspection records, which Plaintiff will produce.

### O. The Rushed, Compromised Walk-Through

65. Plaintiff signed the offer on the Property and wired earnest money before ever seeing it in person. When Plaintiff sought to view the home, she was told she could not do so alone. On December 11, 2023, when Plaintiff asked whether she could simply see the Property herself, Schroder responded: "You can't go by yourself. You must have your realtor present. Anne Marie doesn't represent you."

65A. At no time did Christina Schroder inform Plaintiff that the septic system needed to be inspected; Plaintiff's mother paid for the septic inspection. Moreover, Schroder conducted only a video walk-through of the Property for Plaintiff and expected Plaintiff to proceed with the purchase without physically seeing the home in person; Plaintiff insisted that she needed to see the Property herself before proceeding.

66. Plaintiff's eventual walk-through occurred in late December / early January, during a storm, with the electricity off -- so cold inside that Plaintiff could see her breath. Steven Sikes was present, actively working on the Property, and turned the electricity on so Plaintiff could see. Schroder followed Plaintiff into every room; Plaintiff was never permitted to view any room alone. Plaintiff's partner, Gordon Ellison (now deceased), and a teenage boy were also present. Sikes and Schroder spoke throughout; Plaintiff has recordings of that visit, including Sikes describing the electrical splice work he was performing in the attic.

**P. Schroder Concealed the Defective HVAC System**

67. During the walk-through, Plaintiff asked Schroder about a particular door. Schroder, following directly behind Plaintiff, stated there was "no need to open that door," that it was "just where the HVAC system is," and steered Plaintiff away from it. Behind that door was a decades-old HVAC system with holes in the surrounding wall, cobwebs, dirt, mold, and old ductwork. Had Plaintiff been permitted to see it, she would not have proceeded with the purchase. Plaintiff has photographs of this condition.

68. Steven Sikes later told Plaintiff, by telephone, that he had informed the seller (Nix French) that the entire HVAC system needed to be replaced throughout the house, and that the seller refused, instructing that only "what is on the inspection report" -- a "service" -- be done. A genuine inspection of that system would have revealed, as Sikes did, that it required full replacement. The HVAC failed within approximately two to three months after Plaintiff moved in, in March or April 2024.

**Q. The Fireplace -- A Required Inspection Circumvented and a False "Cap"**

69. The parties' repair amendment required that the fireplace be inspected and cleaned by a licensed chimney sweep. The seller refused to have the fireplace inspected, and that cost was shifted to Plaintiff. Plaintiff -- who had never used the fireplace -- declined to pay to inspect and clean a fireplace she had never used. Rather than performing the required inspection, the amendment was altered: the requirement that the fireplace be "inspected/cleaned by a licensed chimney sweep" was struck through with rows of typed "x" characters, and replaced with the statement, "Chimney was capped when seller had roofing replaced." Katherine Nix French initialed the alteration. The circumvention of the fireplace inspection paralleled the treatment of the HVAC: in each instance, a genuine inspection would have revealed a serious, costly defect, so a genuine inspection was avoided.

70. Had the fireplace actually been inspected, it would have revealed a serious defect. At move-in, the fireplace was filthy, its glass doors detached, with debris, burned cardboard, and burned wood inside, and the surrounding walls blackened. The fireplace

had been represented as "capped." In March or April of the following year, Plaintiff and her two sons burned a fire in the fireplace; the next morning, smoke was observed escaping from the cracks of the purported "cap," and the smoke had exited up the chimney rather than filling the house -- demonstrating the fireplace was not, in fact, sealed as represented. The fireplace was corroded, hazardous, and a fire risk. Plaintiff has video documenting the condition of the fireplace.

**R. Concealed Mold and Other Concealed Defects**

71. The Property contained at least five species of mold. The seller had concealed mold conditions through affirmative means, including "hiding paint" that remains in the home, and "popcorn spray" applied over areas where mold was emerging. Where Plaintiff later applied mold treatment, the popcorn texture fell away and revealed mold growing beneath it. Plaintiff retained the moldy HVAC filter she removed, which is photographed and preserved.

72. The kitchen had been cosmetically upgraded to appear sophisticated while its systems were not functional. The dishwasher was plugged in but not connected to run -- its power would come on and immediately go off. An industrial/restaurant-style sink backed up. The ice-maker water line was not connected, and other water connections were incomplete. Backed-up water would drain into the dishwasher, producing repeated standing water and a foul odor that Plaintiff's partner had to bail out. The dishwasher later leaked, causing the floor to bubble, become wet, and allow water to seep between the floor seams. Plaintiff's insurer, Tower Hill Insurance, sent an inspector who performed a 360-degree camera scan and photographed the damage; those records are obtainable in discovery.

**S. Unpermitted Additions and Work**

73. The Property contained additions and renovations performed without permits and not to professional standards. An added room and bathroom on the left side of the home were constructed over what had been an exterior window -- the window frame

and sill remain visible in the wall -- with plumbing run externally, in a manner apparent as amateur work. Plaintiff confirmed with the Burke County Tax Assessor's office in Waynesboro that no permits were on file for renovations to the Property back to approximately 1984; the only record was an unpaid application for a $40 electrical outlet permit for a camper. On a VA loan, unpermitted additions and non-code work are compliance defects.

**T. The Repair Amendment Was Breached; Required Items Were Never Verified**

74. The repair amendment required, among other things, that wire splices be corrected by a licensed professional (identified as a fire hazard), that the HVAC be serviced/replaced, that the crawl space be cleared, and that the seller provide current repair invoices no later than five days before closing. Steven Sikes -- who performed attic work -- later told Plaintiff he is not an electrician and that the only electrical work he did was install outlet covers; Plaintiff was unable to locate any legitimate business registration or electrical license for Sikes. No re-verification of the required repairs was performed before closing. The only "proof" of repairs was an undated, handwritten receipt authored by Sikes, which was never provided to Plaintiff, was routed to the seller's side, and appears in the seller's contract version but not in Plaintiff's.

**U. The Closing -- January 9, 2024**

75. The closing occurred on January 9, 2024, at the offices of Defendant Findlay, Edenfield & Green, LLC. Although Plaintiff was the buyer -- the party purchasing the home with her VA benefit -- she was given no control over the closing date; the seller and the closing firm dictated the scheduling. In the days before the closing, Plaintiff lost Sasha -- her dog of fifteen years, whom she had raised from birth and who served as her emotional support. Plaintiff asked, through Christina Schroder, that the closing be pushed back on account of her loss; Schroder reported that she asked and the request was refused -- even though Plaintiff had earlier agreed to postpone the closing to accommodate the death of the seller's (Katherine Nix French's) grandfather. That the Defendants could move the date to accommodate the seller's grief, yet deny the buyer the same accommodation in hers, illustrates that the transaction was conducted for the

Defendants' benefit and not Plaintiff's. Distraught, Plaintiff asked how they could refuse her the same accommodation she had extended to them. Plaintiff was forced to drive approximately five hours, alone, across two states, through winter-storm conditions, and attended the closing without support. Plaintiff retains the text messages documenting her postponement request and its refusal.

76. When Plaintiff arrived and gave her name, she was told everyone was waiting and directed into a room behind the front desk. The only persons in that room were the seller, Katherine Nix French; the seller's agent; and Plaintiff. Mark Green then entered. Plaintiff telephoned Christina Schroder, who said she was en route; Schroder then arrived. The room was silent throughout; no one spoke to Plaintiff in the manner customary between a seller and buyer. Defendant Danielle Neef was never present in that room.

**V. Plaintiff Signed a Warranty Deed; the Security Deed and VA Documents Were Suppressed**

77. At closing, Plaintiff was given and signed a warranty deed in the office with Mark Green. Plaintiff was not given a security deed. All relevant VA documentation was omitted from Plaintiff's closing package, and significant documents were suppressed on the day of closing; Plaintiff left with only a warranty deed and an incomplete package.

78. The security deed is facially defective and was not validly executed by Plaintiff. The version Plaintiff has examined (transmitted to her by digital copy on or about January 12, 2024) bears processing barcodes on all seventeen pages and a DocMagic document identifier, reflecting that the instrument was generated and processed electronically through the DocMagic system. Its execution page (the Notice to Borrower page citing 38 C.F.R.) bears a purported signature of Plaintiff with no date, together with Danielle Neef's signature as "unofficial witness" and Mark Green's notarization. The notary block is internally inconsistent: Mark Green's notary seal states "Notary Public, Richmond County, Georgia" (commission expiration 07-18-27), while the printed notary line on the same page states "Notary Public, Burke County." A single notarization cannot occur in two counties. The instrument names Trevor Barrett and Barrett

Financial Group, LLC as loan originator, while United Wholesale Mortgage appears at the top as the lender/post-closing contact -- consistent with the concealment of UWM as the true lender. More than one non-matching version of the security deed exists in the file produced through the servicing chain; the reconciliation of these versions and the authenticity of their execution are the subject of discovery, including the DocMagic and AuthentiSign audit trails.

79. A Limited Power of Attorney was not included in Plaintiff's closing package. It later appeared in the file and was used to execute documents after closing, which explains why versions of the file produced later contain documents that were not present in Plaintiff's closing package.

**W. Mark Green Was Paid by Both Sides and Served the Seller's and Lender's Interests**

80. Plaintiff paid Findlay, Edenfield & Green, LLC $1,487 for the closing, by cashier's check drawn on her credit union. The Closing Disclosure -- including the seller's copy that Plaintiff received from Max Boswell -- reflects that Findlay/Green was also compensated by the seller. Green was thus paid by both the buyer and the seller. As the settlement agent, Green held the transaction funds in escrow, including Plaintiff's, and disbursed checks at closing: the seller and the agents received their payments (the agents receiving thousands of dollars in commissions, as reflected on the Closing Disclosure), while Plaintiff received a nominal check of approximately $100. Notwithstanding that Plaintiff paid the firm and that Green held her funds in escrow, Green took the position in his motion to dismiss in this action that he owed his duty to the lender/broker and not to Plaintiff. A closing attorney who accepts payment from the buyer, holds the buyer's funds in escrow, and is compensated by the seller as well cannot disclaim any duty to that buyer; his conduct served the seller's and lender's interests rather than Plaintiff's. Plaintiff did not select Findlay; Christina Schroder told Plaintiff that Findlay would conduct the closing, and Plaintiff, a first-time buyer, proceeded on that basis.

80A. The two Closing Disclosures generated for this single transaction do not reconcile. Plaintiff's buyer's Closing Disclosure (a DocMagic document bearing Loan ID 1523172699-25 and barcodes on all six pages, date issued January 8, 2024) and the seller's Closing Disclosure (a non-DocMagic document, signed by the seller January 9, 2024) state materially different figures for the seller's side of the same transaction. Plaintiff's copy reports Cash to Seller of $143,903.08 and leaves the first-mortgage-payoff line blank; the seller's copy reports Cash to Seller of $74,475.47 and accounts for a $64,077.96 payoff to Citizens Mortgage and a $10,951.11 seller credit -- a difference of $69,427.61. Plaintiff's disclosure did not merely leave the seller's side blank; it affirmatively computed seller figures that are irreconcilable with the seller's own disclosure and that omit a mortgage payoff which, per the seller's disclosure, was required at closing to convey clear title. The seller's Closing Disclosure was produced to Plaintiff by Findlay, Edenfield & Green -- the closing firm's own production of the document evidencing that the firm was compensated by the seller as well as by Plaintiff.

80B. Plaintiff's Uniform Residential Loan Application in the file reflects the inflated income figure of $4,527.50 and lists debts that are not accurate or complete and are not all Plaintiff's. Plaintiff never reviewed or knowingly executed a loan application containing that income figure or those debts, and would have flagged both had she seen them. By contrast, Plaintiff's genuine, dated signature (January 9, 2024) appears on the fifth page of her closing package, establishing what Plaintiff's authorized execution looks like -- in contrast to the undated, electronically generated purported signatures on the security deed, the fireplace amendment, and the 2016 warranty deed.

80C. The electronic signing envelopes for the transaction were created and controlled through a single AuthentiSign account belonging to the buyer's broker, VanderMorgan (Justin Bolin, jbolin@vandermorganrealty.com), as reflected in the AuthentiSign certificate identifiers. The complete signing audit trail therefore resides in a single custodian's account. Plaintiff's own complete email record contains "Signing Complete" notifications for documents for which no corresponding signing invitation was ever sent to Plaintiff, contrary to the workflow reflected for documents Plaintiff did knowingly execute. The complete AuthentiSign and DocuSign audit histories, and the identity of who applied Plaintiff's signature to each instrument, are the subject of discovery.

### X. The Year-Long Concealment of Plaintiff's Documents

81. For approximately one year, Plaintiff repeatedly demanded her complete transaction file from Defendants -- by email and by certified mail. Findlay, Edenfield & Green, Mark Green, and others withheld Plaintiff's complete file. Barrett Financial produced nothing and directed Plaintiff to UWM; UWM directed Plaintiff back to Barrett Financial and to the title company. To this day, Barrett Financial and UWM have never produced a single

document bearing Plaintiff's name, signature, and Social Security number that Plaintiff requested.

82. Plaintiff possessed, but had no reason to open, a digital copy emailed to her around the time of closing, because she believed she had received her complete contract in hard copy at closing. It was not until 2025 -- when Plaintiff finally obtained a digital copy from the closing law firm, downloaded it, and compared it against the earlier unopened digital copy -- that Plaintiff discovered the documents did not match: the front pages differed, documents had been added, and the versions were materially inconsistent. That comparison was the point at which Plaintiff first discovered the full extent of the alterations.

**Y. Mr. Cooper Acquired the Loan After Plaintiff Warned It Was Fraudulent**

83. In July 2024, Plaintiff contacted Mr. Cooper / Nationstar Mortgage. Her loan had not yet been uploaded into Mr. Cooper's system; Mr. Cooper told Plaintiff it would contact her once the loan appeared. When it did, Plaintiff informed Mr. Cooper of the fraud and problems with the loan. Notwithstanding that warning, Mr. Cooper began servicing Plaintiff's loan in August 2024. Mr. Cooper thus acquired the servicing of a loan it had been specifically warned was fraudulent, and is not an innocent holder. Before the transfer, Plaintiff had repeatedly complained to United Wholesale Mortgage about the loan; UWM gave her the complete runaround, routinely leaving her unable to reach anyone, and taking no corrective action when she did reach someone and complain. UWM then transferred the servicing of Plaintiff's loan -- and it was immediately upon that transfer that Mr. Cooper opened the fraud investigation described below.

**Z. Mr. Cooper's Own Fraud Investigator Documented a Case for Collusion**

84. Plaintiff communicated with Mr. Cooper multiple times. By September 2024, Plaintiff was in contact with Kimberly Keeton, Mr. Cooper's Mortgage Fraud Investigator. On September 10, 2024, Keeton documented in writing that Plaintiff appeared to have a credible case for collusion involving the parties to the transaction, and forwarded her

findings to Lakeview, UWM, and the VA. Despite this internal finding by its own fraud investigator, Mr. Cooper thereafter went silent, continued to collect on the loan, and defended this action.

**AA. The Multiple, Non-Matching Contract Versions**

85. When Plaintiff obtained her transaction documents, she discovered that multiple, materially different versions of her contract existed. Mr. Cooper was the first to produce four different contract versions, on different dates and of different lengths. Findlay, Edenfield & Green subsequently produced a version digitally, and VanderMorgan Realty produced a version by mail. None of these versions match one another, and none match the approximately 55-page contract Plaintiff left the closing with. The differences include added documents and altered pages and are consistent with post-closing alteration and assembly of Plaintiff's file.

**BB. The Scheduled-Then-Abandoned Foreclosure**

86. On or about October 2025, the servicing Defendants, through the law firm McGuireWoods, sent Plaintiff foreclosure notices, including one stating the foreclosure would occur on or about October 10, 2025 -- a date that had already passed when Plaintiff received it. Plaintiff contacted McGuireWoods, and in approximately November received a written response stating that the foreclosure was no longer being pursued at that time because of this lawsuit. Although the loan was substantially in arrears (over $17,000) and Georgia permits non-judicial foreclosure, the servicing Defendants have declined to complete a foreclosure. McGuireWoods also appeared as counsel for the servicing Defendants in this action, and its attorney subsequently withdrew. That the same firm both handled the foreclosure and defended this action, and halted the foreclosure because of the lawsuit, is consistent with the servicing Defendants' awareness of the defects in the loan's origination and in the security deed. Plaintiff retains the foreclosure paperwork.

**CC. The Identity Shell Game and the Credit Reporting**

87. The servicing of Plaintiff's single loan has been conducted under multiple names -- Nationstar Mortgage, Mr. Cooper, and Champion Mortgage -- with Rocket Mortgage, LLC becoming successor by merger effective February 2, 2026. The same loan was reported to the three credit bureaus in three irreconcilable ways: Experian reflected a past-due amount of approximately $18,821 with a worst delinquency of 180 days; TransUnion reflected approximately $2,511 with no delinquency exceeding 60 days; and Equifax reflected $0 past due. These internally impossible, conflicting reports evidence an unreasonable investigation of Plaintiff's disputes.

**DD. Rocket's Suit Against UWM and Plaintiff's Loan**

88. On information and belief, on May 14, 2026, Rocket Mortgage -- as successor to Nationstar Mortgage LLC d/b/a Mr. Cooper -- filed suit against UWM in the New York Supreme Court (Commercial Division) seeking approximately $100 million in damages arising from UWM's bulk sales to Mr. Cooper of servicing rights to nearly 182,000 loans (approximately $65 billion in unpaid principal balance) purchased between January and June 2024. In that complaint, Rocket characterized UWM's business as financially fragile and "heavily dependent on continuously generating origination and refinance volume." Plaintiff's UWM-funded loan closed within that period; whether it was included in those bulk servicing transfers is a matter within Defendants' control and is properly the subject of discovery.

**EE. Aftermath -- Plaintiff Lived in the Home, Then Was Displaced and Forced Out**

89. Plaintiff moved into the Property the second week of February 2024, after her North Carolina lease ended February 3, 2024, and lived there throughout her efforts to obtain answers, demand documents, and file reports. Plaintiff did not live in the Property alone: she resided there with her two adult sons (then ages 23 and 24) and her father, a disabled United States Air Force veteran and amputee who uses a wheelchair and who has diabetes, asthma, and a history of cancer in remission. Plaintiff had taken her father in after his own housing situation ended, and had hoped to build him a wheelchair ramp. When the mold conditions manifested, they endangered her father's health, and he was

forced to leave the Property months before Plaintiff, relocating to family in Decatur, Georgia. All members of Plaintiff's household were ultimately displaced. As the concealed defects manifested -- the HVAC failing within two to three months, the non-functioning plumbing and appliances, the mold, and the uninhabitable fireplace -- the Property became progressively unlivable. Throughout 2024, Plaintiff was displaced back and forth: in the summer months she was forced to stay in Airbnbs and hotels because the failed HVAC left the home unbearable; in the winter months she returned but was reduced to sealing off the rear bedroom portion of the house and sleeping in the front, using space heaters, to survive the cold. In 2025, Plaintiff left the Property for good. She stayed in Airbnbs and hotels and briefly at her son's home; when her son had to move, she returned to Airbnbs and hotels until she could no longer afford them. On September 1, 2025, Plaintiff and her young granddaughter moved in with Plaintiff's mother. Approximately one month later, Plaintiff's mother helped her rent a home in Greenville, North Carolina; because of the financial devastation caused by this transaction, the lease was placed in her mother's name, though Plaintiff pays the rent and resides there with her granddaughter, and the lease is now being placed in Plaintiff's name. Plaintiff's landlord is aware of this lawsuit and Plaintiff's circumstances.

90. Plaintiff has not lost the Property to foreclosure; she retains it but has lost its use and habitability while remaining obligated on the fraudulent mortgage. Plaintiff earlier applied to proceed in forma pauperis due to the financial hardship this transaction caused; that application was denied and Plaintiff paid the filing fee. Plaintiff was unable to retain counsel: she contacted numerous attorneys in the region, at least one of whom declined citing a conflict of interest, reflecting the Defendants' interconnection with the local legal and real estate community, which is why Plaintiff proceeds pro se.

**FF. Plaintiff's Treatment as a Black Woman and the Boswell Communications**

90A. Plaintiff is an Afro American woman. Every professional on the Defendants' side of this transaction -- the buyer's agent, the listing agent and broker, the appraiser, the inspector, the closing attorney, and the seller -- is Caucasian. Throughout the transaction, Plaintiff was made to feel less than and that her interests did not matter. The listing brokerage and its agents ordinarily deal in substantially higher-value

properties, ranging from approximately $200,000 to multimillion-dollar homes and land; yet Plaintiff, a disabled Black veteran, was steered into a defective home through the fraudulent conduct described above.

90B. After Plaintiff publicly posted the transaction documents and videos of Amendment #1 and the Property's condition on social media and attempted to tag the involved parties (whose tagging was thereafter prevented), Max Boswell telephoned Plaintiff one morning while she was driving to a medical appointment, at the intersection of Mike Padgett Highway and Tobacco Road in Augusta. Plaintiff's sister, Joyce Basden, was on the line. Boswell grew progressively louder and more defensive, insisting without prompting that "we are not racist." Plaintiff asked whether that was the only reason he had called, and told Boswell that she has documented PTSD and that he was actively triggering her. Boswell then de-escalated, and stated that there was something in the seller's version of the contract that was not in Plaintiff's version, and offered to furnish Plaintiff a copy of the seller's version, asking when she could pick it up.

90C. Plaintiff went to Max Boswell's office at Mary Yelton Realty at approximately 3:00 p.m., between June and July 2024, to pick up the seller's version, as arranged by text message. Seated in Boswell's office with Boswell and Anne Marie Kyzer present, Boswell opened the contract and showed Plaintiff Amendment #1 -- the first document he showed her -- while explaining the discrepancies. Plaintiff broke down crying. Boswell repeatedly apologized, saying words to the effect of "we're so sorry this happened to you," and offered that if Plaintiff ever wanted to sell the house, they would help her sell it. Kyzer said nothing throughout. As to the fireplace, Boswell stated that they had tried to reach Christina Schroder and, being unable to, "went ahead and did it" -- and Justin Bolin's name appears at the bottom of Amendment #1. Plaintiff's text messages with Schroder contain no representation that the fireplace was "capped."

90D. At Tina Thornton's direction, Plaintiff's mother and stepfather executed a gift letter representing that funds they provided to Plaintiff were a gift, when in fact the funds were a loan Plaintiff repaid. Thornton indicated that the loan would not be approved if the true nature of the funds were disclosed. That gift letter bears "UWM" in small print in its lower-left corner -- again reflecting UWM as the true lender behind documents Barrett and Thornton handled.

## V. CLAIMS FOR RELIEF

### COUNT ONE -- Violation of RICO, 18 U.S.C. Section 1962(c)

*(Against Barrett Financial Group, Tina Thornton, United Wholesale Mortgage, VanderMorgan Realty, Justin Bolin, Mary Yelton Realty d/b/a Boswell Realty, Max Boswell, Anne Marie Kyzer, Kris Hardy, All Star Home Inspections, Chuck Tolbert, Findlay Edenfield & Green, Mark Green, Danielle Neef, Steven Sikes, Katherine Nix French, Mr. Cooper / Nationstar Mortgage, and Lakeview Loan Servicing)*

91. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

92. At all relevant times, the Defendants named in this Count formed an association-in-fact enterprise within the meaning of 18 U.S.C. Section 1961(4) (the "Enterprise"). The Enterprise was an ongoing organization whose members functioned as a continuing unit for the common purpose of originating, closing, and profiting from Plaintiff's VA-backed home purchase through fraud, and it existed separate and apart from the pattern of racketeering activity.

93. The Enterprise engaged in, and its activities affected, interstate commerce. The origination involved parties in Arizona (Barrett Financial), Nevada (Thornton's telephone operations), and Michigan (UWM), and the Property and closing were in Georgia. Throughout the transaction, Plaintiff was a resident of North Carolina. The Defendants transmitted loan documents, disclosures, and electronic-signature requests across state lines to Plaintiff in North Carolina to be signed, and those and related documents were transmitted from Georgia and elsewhere in return; certain documents were signed in Georgia. The resulting mortgage was thereafter sold and serviced across state lines.

94. Each Defendant named in this Count participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of multiple related predicate acts of wire fraud (18 U.S.C. Section 1343) and mail fraud (18 U.S.C. Section 1341). The specific role of each participant included:

(a) Tina Thornton and Barrett Financial Group -- steered Plaintiff from her legitimate lenders, originated the loan while Thornton was unlicensed in Georgia, inflated Plaintiff's income to $4,527.50, misclassified the VA loan as FHA (December 22, 2023 email), and both ordered and paid for the appraisal;

(b) United Wholesale Mortgage -- underwrote and table-funded the loan while concealed behind Barrett as "Lender," accepted and used the inflated income figures, and falsely represented to the CFPB that the VA had assigned the appraiser;

(c) VanderMorgan Realty (through Christina Schroder) and Justin Bolin -- steered Plaintiff off her Veterans United approval and her own credit union to Thornton, concealed the defective HVAC system, and applied pressure despite Plaintiff's disclosed disability; and, through Bolin's single AuthentiSign account (jbolin@vandermorganrealty.com), created and controlled the electronic signing envelopes through which Plaintiff's signature was applied to instruments she never knowingly signed and through which "Signing Complete" notices were generated for documents Plaintiff was never sent for signing -- thereby supplying and controlling the mechanism by which Plaintiff's assent was manufactured;

(d) Mary Yelton Realty d/b/a Boswell Realty, Max Boswell, and Anne Marie Kyzer -- conducted the listing side of the transaction under a dissolved entity, produced the altered contract version, and executed the false Real Estate Certification;

(e) Kris Hardy -- performed a non-independent appraisal, ordered and paid by the broker, returning a value precisely matching the loan amount and falsely certifying the Property's condition;

(f) All Star Home Inspections (through Dwayne Higdon, the inspector) and Chuck Tolbert -- performed and documented an inadequate inspection while financially affiliated with the selling agents, failing to disclose the Property's defects;

(g) Findlay, Edenfield & Green, Mark Green, and Danielle Neef -- conducted a closing at which Plaintiff's complete file and required VA documents were suppressed, delivered a facially defective security deed, executed a false witness attestation, and thereafter withheld Plaintiff's file;

(h) Steven Sikes -- generated false repair documentation representing that required repairs were completed; and

(i) Katherine Nix French -- concealed the Property's known defects and sold it through the altered and fraudulent documents.

(j) Mr. Cooper / Nationstar Mortgage and Lakeview Loan Servicing -- as the post-closing servicer/holder and investor, received and continued servicing and enforcing the fraudulently originated loan after Plaintiff reported the fraud and after Mr. Cooper's own fraud investigator documented a credible collusion concern, continuing collection, credit reporting, and foreclosure activity through interstate communications as part of the continuing pattern.

95. These predicate acts also included the interstate transmission and application of Plaintiff's fabricated electronic signature (including the Pacific-Time-stamped signature on the FHA Amendatory Clause, the altered fireplace amendment, and the prior

warranty deed) through the DocuSign, AuthentiSign, and DocMagic platforms; the transmission of UWM's Loan Approval Conditions reflecting the inflated income; the transmission of materially inconsistent, altered contract versions; the concealment of Plaintiff's complete file for approximately one year; and the continued interstate collection on the fraudulently originated loan.

96. These predicate acts were related -- sharing the common purpose of inducing Plaintiff to close on the fraudulent loan and profiting from it, the same victim, and interrelated participants and methods -- and were continuous, spanning from November 2023 through the present, thereby constituting a pattern of racketeering activity.

96A. The predicate acts constitute a pattern of racketeering activity under 18 U.S.C. Section 1961(5) because they are both related and continuous. They are related in that they shared the same purpose (inducing Plaintiff to close on and remain bound to the fraudulent VA-backed loan and profiting from it), the same victim (Plaintiff), the same participants acting in coordinated roles, and the same methods (misrepresentation, concealment, fabrication of documents, and interstate wire and mail transmissions). They are continuous in that they began in November 2023 with the steering of Plaintiff and have continued without interruption through the fabrication and recording of documents, the concealment of Plaintiff's complete file for approximately one year, the transfer and servicing of the loan, the scheduled-then-abandoned foreclosure, the ongoing false credit reporting, and the continuing collection on the loan to the present day. The scheme is not a closed, completed episode but an open-ended course of conduct that continues to injure Plaintiff, whose VA home-loan entitlement remains encumbered and whose loan the Defendants continue to enforce.

97. As a direct and proximate result of the Defendants' violation of 18 U.S.C. Section 1962(c), Plaintiff has been injured in her property, including the fraudulent $160,000 mortgage obligation on which she remains liable, the loss of the use and habitability of her home, and her out-of-pocket financial losses. Pursuant to 18 U.S.C. Section 1964(c), Plaintiff is entitled to recover treble (threefold) her damages, together with the costs of this action, including the costs of service occasioned by Defendants' refusal to waive service under Fed. R. Civ. P. 4(d), and attorney's fees to the extent recoverable or if Plaintiff is represented by counsel.

**COUNT TWO -- RICO Conspiracy, 18 U.S.C. Section 1962(d)**

*(Against Barrett Financial Group, Tina Thornton, United Wholesale Mortgage, VanderMorgan Realty, Justin Bolin, Mary Yelton Realty d/b/a Boswell Realty, Max Boswell, Anne Marie Kyzer, Kris Hardy, All Star Home Inspections, Chuck Tolbert, Findlay Edenfield & Green, Mark Green, Danielle Neef, Steven Sikes, Katherine Nix French, Mr. Cooper / Nationstar Mortgage, and Lakeview Loan Servicing)*

98. Plaintiff realleges and incorporates paragraphs 30 through 97 as though fully set forth herein.

99. The Defendants named in this Count knowingly and willfully conspired and agreed with one another to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through the pattern of racketeering activity described in Count One, in violation of 18 U.S.C. Section 1962(c).

100. Each conspiring Defendant knew of and agreed to the overall objective of the conspiracy -- to induce Plaintiff, a disabled veteran using her VA benefit for the first time, to close on the fraudulent VA-backed loan and to profit from that transaction -- and knowingly facilitated it. The existence of the agreement is shown by the coordinated, interlocking nature of the Defendants' conduct: Schroder steered Plaintiff from her legitimate lenders directly to Thornton, whom Schroder described as a "VA magician"; Thornton and Barrett inflated Plaintiff's income and misclassified the loan; UWM funded and underwrote it while concealed behind Barrett; Barrett ordered and paid the appraiser, Hardy, who returned a value precisely matching the loan; the inspector, All Star (through Higdon), financially affiliated with the selling agents, failed to disclose the defects; the seller and listing agents (Nix French, Kyzer, Mary Yelton/Boswell) concealed the defects and executed the false certifications; Sikes generated a false, undated repair receipt representing that required repairs were complete; and the closing was conducted by Green, who served the seller's and lender's interests and suppressed Plaintiff's documents. These roles fit together as parts of a single, coordinated scheme, and each Defendant played an assigned part in it.

101. Each Defendant committed overt acts in furtherance of the conspiracy, including those set forth in the Statement of Facts and in Count One, and adopted the goal of furthering and facilitating the Enterprise's scheme.

102. As a direct and proximate result of the conspiracy in violation of 18 U.S.C. Section 1962(d), Plaintiff has been injured in her property, entitling her to treble damages and costs as provided by statute.

## COUNT THREE -- Violation of the Truth in Lending Act (TILA), 15 U.S.C. Section 1601 et seq.

*(Against Barrett Financial Group, Tina Thornton, and United Wholesale Mortgage)*

103. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

104. Plaintiff's loan is a consumer credit transaction secured by her principal dwelling, subject to TILA and its implementing Regulation Z, 12 C.F.R. Part 1026. TILA requires the accurate and conspicuous disclosure of the identity of the creditor and of material loan terms.

105. Defendants Barrett Financial, Thornton, and UWM violated TILA and Regulation Z by, among other things: (a) designating Barrett Financial -- a mortgage broker -- as "Lender" on the Closing Disclosure and related federally required documents, when United Wholesale Mortgage was the actual creditor and table-funding lender, and UWM has admitted it "performed the underwriting review" of the loan, thereby concealing the true creditor's identity; (b) originating and underwriting the loan using a "Verified Income" of $4,527.50, inflated by approximately $790 to $930 per month above Plaintiff's true VA disability income of approximately $3,595.95 to $3,737.85, and falsely characterizing that income as paid biweekly when VA disability is paid monthly, rendering the disclosures materially inaccurate; and (c) misclassifying the VA loan as an FHA loan and providing an FHA Amendatory Clause in place of the mandatory VA escape clause.

106. Defendants concealed these violations from Plaintiff, including by withholding her complete loan file for approximately one year, such that Plaintiff could not have

discovered them at closing. The limitations period is tolled as set forth in the section on the Discovery Rule and Equitable Tolling below.

107. As a direct and proximate result of these TILA violations, Plaintiff is entitled to actual damages, statutory damages, and costs as provided under 15 U.S.C. Section 1640.

## COUNT FOUR -- Violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. Section 2601 et seq.

*(Against VanderMorgan Realty, Justin Bolin, Tina Thornton, Barrett Financial Group; and as to servicing, Mr. Cooper / Nationstar Mortgage and Lakeview Loan Servicing)*

108. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

109. Steering and referral (12 U.S.C. Section 2607). RESPA prohibits the giving or accepting of any fee, kickback, or thing of value pursuant to an agreement or understanding to refer settlement-service business in a federally related mortgage loan. VanderMorgan Realty (through Christina Schroder) steered Plaintiff away from her legitimate, pre-approved lender, Veterans United Home Loans, and from her own credit union, and directly to Tina Thornton and Barrett Financial, whom Schroder personally solicited to Plaintiff as a "VA magician" who could "do things... that Veteran's United has not." This steering, and the arrangement between the buyer's agent and the originator that it reflects, was not disclosed to Plaintiff and served the Defendants' interests rather than Plaintiff's. The existence and terms of any referral arrangement, fee, or thing of value exchanged among these Defendants are within their control and are the subject of discovery.

110. Servicing violations (12 U.S.C. Section 2605). After Mr. Cooper acquired servicing, Plaintiff submitted written requests, including Qualified Written Requests and demands for validation of the debt and for her complete loan file. Mr. Cooper and Lakeview failed to conduct a proper investigation or provide the substantive responses RESPA requires;

instead, Mr. Cooper deflected Plaintiff's requests, directed her elsewhere, and copied Barrett Financial's principals on its responses, while continuing to collect on and report the loan. These acts violated Mr. Cooper's and Lakeview's servicing obligations under 12 U.S.C. Section 2605. It was not until June 2025, after Plaintiff threatened litigation and stated she would pursue the matter in court, that Mr. Cooper began sending Plaintiff loan documentation -- characterizing it as material it had just received from United Wholesale Mortgage, in an apparent effort to distance itself from the origination.

111. As a direct and proximate result of these RESPA violations, Plaintiff has suffered actual damages and is entitled to the damages, including any statutory and pattern-or-practice damages, and costs provided under 12 U.S.C. Section 2605(f) and Section 2607(d).

**COUNT FIVE -- Violation of the Fair Credit Reporting Act (FCRA), 15 U.S.C. Section 1681s-2(b)**

*(Against Mr. Cooper / Nationstar Mortgage, d/b/a Champion Mortgage, and its successor Rocket Mortgage, LLC)*

112. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

113. Mr. Cooper / Nationstar is a "furnisher" of information to consumer reporting agencies within the meaning of the FCRA. Under 15 U.S.C. Section 1681s-2(b), upon receiving notice of a dispute from a consumer reporting agency, a furnisher must conduct a reasonable investigation of the disputed information, review all relevant information, and correct or delete information that is inaccurate or cannot be verified.

114. Plaintiff disputed the reporting of her loan through the consumer reporting agencies. Mr. Cooper / Nationstar failed to conduct a reasonable investigation, as demonstrated by the internally impossible, conflicting results of its reporting of the same single loan: Experian reflected approximately $18,821 past due with a worst delinquency of 180 days; TransUnion reflected approximately $2,511 with no

delinquency exceeding 60 days; and Equifax reflected $0 past due. A single account cannot simultaneously be 180 days delinquent, no more than 60 days delinquent, and current with a zero balance. These irreconcilable reports establish that no reasonable investigation was conducted. Mr. Cooper's furnishing was further unreliable given its servicing of the loan under multiple names (Nationstar, Mr. Cooper, Champion Mortgage) and the loan's contested, fraud-tainted status.

115. As a direct and proximate result of these FCRA violations, Plaintiff has suffered actual damages, including harm to her credit, and is entitled to actual, statutory, and -- for willful noncompliance -- punitive damages and costs under 15 U.S.C. Sections 1681n and 1681o.

## COUNT SIX -- Violation of the Fair Housing Act (Race and Disability Discrimination), 42 U.S.C. Section 3601 et seq.

*(Against Tina Thornton, Barrett Financial Group, United Wholesale Mortgage, VanderMorgan Realty, Justin Bolin, Anne Marie Kyzer, Mary Yelton Realty d/b/a Boswell Realty, and Max Boswell)*

116. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

117. Plaintiff is a person with a disability within the meaning of the Fair Housing Act, 42 U.S.C. Section 3602(h). The FHA prohibits discrimination in the sale or rental of housing and in residential real-estate-related transactions, including the making or purchasing of loans, on the basis of race and disability, 42 U.S.C. Sections 3604 and 3605. Plaintiff is an Afro American woman and a person with a disability. Plaintiff's treating psychotherapist through the U.S. Department of Veterans Affairs is willing to produce Plaintiff's clinical records and notes if subpoenaed by the Court.

118. From Plaintiff's first communication -- "Hi I'm a veteran... I would be a first time buyer" -- every Defendant named in this Count knew that Plaintiff was a disabled veteran using her VA benefit and VA disability income. These Defendants discriminated

against Plaintiff on the basis of her disability by, among other things: (a) exploiting her disability income and stripping her disability-related protections -- Thornton, Barrett, and UWM built the loan on Plaintiff's VA disability income, inflated that income, and stripped the VA escape clause to which she was entitled, subjecting her to terms and treatment different from those afforded non-disabled borrowers; (b) denying access and applying pressure after disability disclosure -- after Plaintiff disclosed her PTSD and asked to slow down, VanderMorgan (through Schroder) pressured her to proceed, denied her the ability to view the Property except under conditions the Defendants controlled, and steered her into the transaction, and Kyzer, the listing agent, likewise denied Plaintiff a normal opportunity to view the home; and (c) conducting the discriminatory transaction under a dissolved entity -- Mary Yelton Realty d/b/a Boswell Realty and Max Boswell served as the listing brokerage and broker in the transaction while operating under a dissolved entity. Plaintiff, an Afro American woman, was also subjected to discriminatory treatment on the basis of race: she was steered by an all-Caucasian network of professionals into a predatory, fraudulent transaction and a defective home, was made to feel less than throughout, and, when she publicly identified the misconduct, was contacted by Max Boswell, who insisted without prompting that "we are not racist" -- conduct from which discriminatory animus may be inferred. In each instance, these Defendants' knowledge that Plaintiff was a disabled veteran relying on VA disability income and VA-specific loan protections was not incidental but central to how they treated her: they built the transaction around her disability income, stripped the protections owed to her as a VA borrower, and proceeded despite her disclosed PTSD and her requests to slow down. A non-disabled borrower not dependent on VA disability income and VA protections would not have been subjected to the same exploitation.

119. As a direct and proximate result of these violations of the Fair Housing Act, Plaintiff has suffered actual damages, including economic loss and severe emotional distress, and lasting harm to her ability and willingness to pursue homeownership and her trust in real estate and mortgage professionals, and is entitled to actual and punitive damages and costs under 42 U.S.C. Section 3613.

**COUNT SEVEN -- Fraud and Fraudulent Concealment (O.C.G.A. Section 51-6-2, Section 23-2-52)**

*(Against Tina Thornton, Barrett Financial Group, United Wholesale Mortgage, VanderMorgan Realty, Justin Bolin, Mary Yelton Realty d/b/a Boswell Realty, Max Boswell, Anne Marie Kyzer, Kris Hardy, All Star Home Inspections, Chuck Tolbert, Findlay Edenfield & Green, Mark Green, Danielle Neef, Steven Sikes, and Katherine Nix French)*

120. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

121. Each Defendant named in this Count made material misrepresentations to Plaintiff, or concealed material facts Defendant had a duty to disclose, with knowledge of their falsity, intending that Plaintiff rely on them; Plaintiff justifiably relied to her detriment. The specific fraudulent conduct of each Defendant is as follows:

(a) Tina Thornton and Barrett Financial Group misrepresented Plaintiff's income as $4,527.50 when they possessed her true income documentation showing approximately $3,595.95 to $3,737.85; falsely characterized her monthly VA income as paid biweekly; represented Thornton as a qualified originator when she was not licensed in Georgia; misclassified the VA loan as FHA; concealed the true lender by naming Barrett as "Lender"; and ordered and paid for the appraisal in violation of appraisal independence. The Uniform Residential Loan Application in the file reflects the inflated $4,527.50 income and debts that are not accurate or all Plaintiff's, which Plaintiff never knowingly executed. When Plaintiff needed help with a transaction cost and told Thornton she could obtain the funds from her mother and stepfather as a repayable loan, Thornton instructed that the funds be documented as a gift and directed Plaintiff to have her mother and stepfather complete a gift letter to that effect; the funds were in fact repaid by Plaintiff. The gift letter bears "UWM" in small print in its lower-left corner. This conduct occurred during origination, from approximately late November 2023 through the January 9, 2024 closing, by email, telephone, and electronic document transmission.

(b) United Wholesale Mortgage concealed that it was the true lender while permitting Barrett to be named "Lender"; used Plaintiff's inflated income to underwrite the loan; and represented to the CFPB, on July 15, 2026, that the VA had assigned the appraiser, a statement contradicted by Hardy's own filed invoice and report.

(c) VanderMorgan Realty (through Christina Schroder) and Justin Bolin falsely disparaged Veterans United to steer Plaintiff away from her legitimate approval; represented Thornton as a "VA magician"; concealed the defective HVAC system by directing Plaintiff away from the HVAC closet during the walk-through ("no need to open

that door"); pressed Plaintiff to proceed while concealing material defects; and, through Bolin's single AuthentiSign account, created and controlled the electronic signing envelopes through which Plaintiff's signature was applied to documents she never knowingly executed, including the fireplace amendment (on which Plaintiff's signature alone bears no platform capture identifier) and a 2016 warranty deed to which Plaintiff was never a party.

(d) Mary Yelton Realty d/b/a Boswell Realty, Max Boswell, and Anne Marie Kyzer produced and transmitted the altered contract documents; executed and caused to be executed the false Real Estate Certification (Kyzer, December 27, 2023) attesting there were "no amendments or counterletters" when the transaction contained altered documents; and conducted the transaction under a dissolved entity, concealing that fact.

(e) Kris Hardy falsely certified the Property's condition as having "no physical deficiencies or adverse conditions" and "no updates in the prior 15 years"; described a capped, unusable wood fireplace as a functioning "Gas, propane, vented" fireplace; returned a value of exactly $160,000 -- matching the loan amount to the dollar -- after the Property had recently been listed for as low as $150,000, evidencing a valuation worked backward from the predetermined loan amount rather than an independent appraisal; and, when Plaintiff requested her appraisal, first claimed a "wrong number," and when Plaintiff called back, stated that he could not provide any information because the matter was in litigation -- refusing to provide Plaintiff her own appraisal.

(f) All Star Home Inspections (through Dwayne Higdon) and Chuck Tolbert issued an inspection report that failed to disclose the fire-hazard wiring, the capped/hazardous fireplace, and the HVAC's need for replacement. All Star was retained by Christina Schroder, not by Plaintiff; no mold testing was ordered for Plaintiff; and it is well known in the region that VanderMorgan Realty and All Star Home Inspections work closely together, as reflected on social media. All Star was also financially affiliated with the selling side as an affiliate member and sponsor of the REALTORS of Greater Augusta -- a conflict not disclosed to Plaintiff.

(g) Findlay, Edenfield & Green, Mark Green, and Danielle Neef conducted a closing at which required VA documents and Plaintiff's complete file were suppressed; delivered a security deed that was not provided at closing, was generated through DocMagic and barcoded on all pages, bears an undated purported signature of Plaintiff and a notary block naming two different counties (Richmond seal, Burke printed line), and exists in more than one non-matching version; produced two Closing Disclosures for the single transaction that do not reconcile and that omit from Plaintiff's copy a $64,077.96 payoff shown on the seller's copy; and thereafter withheld Plaintiff's complete file for approximately one year. Danielle Neef signed as "unofficial witness" though not present at Plaintiff's closing. Plaintiff left the closing with an approximately 55-page contract; approximately two days later, on or about January 12, 2024, an approximately 128-page

package arrived in Plaintiff's email -- containing roughly 50 additional pages that were not in Plaintiff's closing package, including the security deed.

(h) Steven Sikes generated an undated repair receipt representing that required repairs -- including electrical work he was not licensed to perform -- had been completed. That undated repair receipt was contained in the seller's version of the contract; Plaintiff never saw it during her transaction and saw it for the first time only when she obtained the seller's version of the contract from Max Boswell.

(i) Katherine Nix French concealed the Property's known defects -- including the HVAC's need for full replacement, of which she had been informed and which she declined to remedy; the mold concealed by hiding paint and popcorn spray; the capped, hazardous fireplace; and the non-functioning systems -- and sold the Property through the altered and fraudulent documents while representing it as sound. As to the altered fireplace amendment (Amendment #1), Max Boswell admitted to Plaintiff that, being unable to reach Christina Schroder, the brokerage "went ahead and did it"; Justin Bolin's name appears at the bottom of that amendment; and Plaintiff's text messages with Schroder contain no representation that the fireplace was "capped."

122. These Defendants further engaged in fraudulent concealment, actively hiding the alterations, the true lender's identity, the property defects, and Plaintiff's own documents, thereby preventing Plaintiff from discovering the fraud until 2025, as set forth in the tolling section below.

123. Each Defendant knew Plaintiff was a disabled veteran using her VA benefit for the first time and intended that she rely on their misrepresentations and omissions. Plaintiff justifiably relied and was damaged.

123A. Plaintiff's reliance was justifiable and direct. As a first-time buyer who expressly told these Defendants she was relying on them, Plaintiff had no independent means to know that her income had been inflated, that the lender named was not the true lender, that the appraisal had been ordered and paid by the broker, that her signature had been fabricated, or that the Property's systems were defective and concealed -- because the Defendants controlled that information and concealed it. Had Plaintiff known any of these facts, she would not have closed on the loan or the Property. She proceeded only because she reasonably trusted the representations of the professionals she had engaged, and she was damaged as a direct result.

124. As a direct and proximate result, Plaintiff has suffered actual damages, and, because Defendants' conduct showed willful misconduct, malice, fraud, wantonness,

oppression, and a conscious indifference to consequences, Plaintiff is entitled to punitive damages under O.C.G.A. Section 51-12-5.1.

## COUNT EIGHT -- Negligent Misrepresentation and Negligence

*(Against Tina Thornton, Barrett Financial Group, United Wholesale Mortgage, Kris Hardy, All Star Home Inspections, Chuck Tolbert, Findlay Edenfield & Green, Mark Green, VanderMorgan Realty, Justin Bolin, Anne Marie Kyzer, Mary Yelton Realty d/b/a Boswell Realty, and Max Boswell)*

125. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

126. In the alternative to Count Seven, each Defendant named in this Count owed Plaintiff a duty of care in supplying information and performing professional services in the transaction, negligently supplied false information or performed those services negligently, and Plaintiff justifiably relied to her detriment.

127. Specifically: Thornton, Barrett Financial, and United Wholesale Mortgage negligently supplied and relied upon false income and loan-type information and negligently originated and underwrote the loan; Hardy negligently performed and reported the appraisal; All Star (through Higdon) and Tolbert negligently performed and reported the inspection; Findlay and Green negligently performed the closing and the handling of Plaintiff's documents, deed, and recording; and VanderMorgan (through Schroder), Justin Bolin, Kyzer, Mary Yelton/Boswell, and Max Boswell negligently supplied false or incomplete information about the Property and the transaction, negligently controlled the electronic signing process, and breached the standard of care owed by real estate professionals. Plaintiff, a first-time buyer who informed these Defendants she was relying on them, justifiably relied.

128. As a direct and proximate result, Plaintiff has suffered actual damages.

**COUNT NINE -- Breach of Contract (O.C.G.A. Section 13-6-1 et seq.)**

*(Against Katherine Nix French, Mary Yelton Realty d/b/a Boswell Realty, Max Boswell, Anne Marie Kyzer, VanderMorgan Realty, All Star Home Inspections, Chuck Tolbert, Findlay Edenfield & Green, Mark Green, Barrett Financial Group, United Wholesale Mortgage, and Mr. Cooper / Nationstar Mortgage)*

129. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

130. Plaintiff had contractual relationships with each Defendant named in this Count, and each breached the terms of, or the covenants implied in, those contracts:

(a) Katherine Nix French, as seller, breached the purchase agreement and its repair amendment by: failing to complete required repairs, including the HVAC; improperly shifting the septic-inspection obligation onto Plaintiff and then causing it to be removed from the contract rather than fulfilling it; failing to have the fireplace inspected and cleaned by a licensed chimney sweep as required, improperly shifting that obligation to Plaintiff, and causing the requirement to be altered ("chimney was capped") rather than fulfilled; failing to provide Plaintiff with the required current repair invoices no later than five days before closing, the only repair documentation being an undated Sikes receipt that appeared in the seller's contract version but not in Plaintiff's; and selling the Property with concealed, undisclosed defects.

(b) Mary Yelton Realty d/b/a Boswell Realty, Max Boswell, and Anne Marie Kyzer, as the listing brokerage, broker, and agent, breached their obligations in the transaction, including by producing and transmitting altered contract documents, failing to ensure the seller's repair and documentation obligations were satisfied, and conducting the transaction under a dissolved entity.

(c) VanderMorgan Realty (through Christina Schroder), as Plaintiff's buyer's brokerage, breached the buyer-agency relationship by failing to act in Plaintiff's interest, steering her from her legitimate financing, failing to ensure the seller's obligations were met before closing, and failing to protect her in the transaction.

(d) All Star Home Inspections and Chuck Tolbert breached the home-inspection contract by failing to perform a competent inspection and failing to disclose the Property's material defects.

(e) Findlay, Edenfield & Green and Mark Green breached the closing-services engagement -- for which Plaintiff paid $1,487 -- by closing the transaction without confirming that the contract's stated conditions (including the required repair invoices) were satisfied, by failing to deliver Plaintiff's complete executed package and required

documents at closing, by mishandling and recording a defective security deed, and by withholding Plaintiff's file.

(f) Barrett Financial Group and United Wholesale Mortgage breached the loan agreement and its implied covenant of good faith by originating and funding the loan on fraudulent, inflated, and misrepresented terms; and Mr. Cooper / Nationstar Mortgage, as holder and servicer, took and enforced a loan contract that was breached at origination and breached its own servicing obligations.

131. As a direct and proximate result of these breaches, Plaintiff has suffered actual damages.

## COUNT TEN -- Legal Malpractice and Breach of Fiduciary Duty

*(Against Findlay Edenfield & Green and Mark Green; and Breach of Fiduciary Duty against VanderMorgan Realty and Justin Bolin)*

132. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

133. Findlay, Edenfield & Green and Mark Green. Plaintiff paid Findlay, Edenfield & Green $1,487 for closing services, and Green held Plaintiff's funds in escrow as settlement agent. Green thereby owed Plaintiff duties of competence, loyalty, and care. Green breached those duties by conducting a closing at which Plaintiff's required documents were suppressed, by delivering and recording a defective security deed, by failing to deliver Plaintiff's complete file, by failing to confirm the contract's conditions were met before closing, by an undisclosed conflict of interest in being compensated by both the buyer and the seller, and by serving the seller's and lender's interests rather than Plaintiff's. Green cannot accept Plaintiff's payment, hold her funds in escrow, and simultaneously disclaim any duty to her, as he has attempted to do in this action.

134. VanderMorgan Realty (through Christina Schroder) and Justin Bolin. As Plaintiff's buyer's agent, Schroder owed Plaintiff fiduciary duties of loyalty, disclosure, and care. Schroder breached those duties by steering Plaintiff from her legitimate, pre-approved lender to Thornton; by concealing material defects, including the HVAC system; by

pressuring Plaintiff to proceed after Plaintiff disclosed her disability and asked to slow down; and by failing to act in Plaintiff's interest. On information and belief, Schroder also held undisclosed interests as a real estate investor with financial relationships to properties and sellers, creating a conflict of interest not disclosed to Plaintiff. Justin Bolin, as the broker responsible for supervising Schroder, is liable for these breaches.

135. As a direct and proximate result of these breaches of duty, Plaintiff has suffered actual damages and, given the conscious disregard of Plaintiff's interests, is entitled to punitive damages under O.C.G.A. Section 51-12-5.1.

## COUNT ELEVEN -- Civil Conspiracy

*(Against all Defendants named in Count One)*

136. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

137. The Defendants named in this Count acted in concert, pursuant to a common design and understanding, to accomplish the unlawful purpose of inducing Plaintiff to close on the fraudulent VA-backed loan and profiting from that transaction, and to accomplish lawful purposes by unlawful means, including fraud, concealment, forgery of Plaintiff's signature, and the other wrongful conduct set forth above.

138. Each Defendant knowingly and voluntarily participated in the common scheme, and committed overt tortious acts in furtherance of it, as set forth in the Statement of Facts. The interlocking roles of the Defendants -- the steering, the income inflation, the loan misclassification, the non-independent appraisal, the inadequate inspection, the concealment of defects, the fabricated signatures, and the compromised closing -- reflect a coordinated agreement rather than independent conduct.

139. As a direct and proximate result of the conspiracy, Plaintiff has suffered actual damages, and, because the conspiracy was carried out with malice, fraud, and

conscious indifference to consequences, Plaintiff is entitled to punitive damages under O.C.G.A. Section 51-12-5.1.

## COUNT TWELVE -- Declaratory and Injunctive Relief (28 U.S.C. Sections 2201-2202)

*(Against United Wholesale Mortgage, Barrett Financial Group, Mr. Cooper / Nationstar Mortgage and its successor Rocket Mortgage, LLC, and Lakeview Loan Servicing)*

140. Plaintiff realleges and incorporates paragraphs 30 through 90 as though fully set forth herein.

141. An actual, justiciable controversy exists between Plaintiff and the Defendants named in this Count concerning the validity and enforceability of the loan and the security instrument secured against the Property. Plaintiff contends that the loan was fraudulently originated -- through inflated income, a concealed lender, an unlicensed originator, a non-independent appraisal, and the stripping of Plaintiff's VA protections -- and that the security deed is facially defective and unenforceable, existing in two conflicting recorded versions, with missing pages, a false witness attestation by Danielle Neef, and conflicting notary counties, and having never been provided to Plaintiff at closing.

142. These Defendants, by contrast, continue to treat the loan and the security deed as valid, have continued to collect on the loan, and threatened but did not complete a foreclosure -- halting it, through counsel, because of this lawsuit -- conduct consistent with their awareness of the defects. The fraudulent loan further remains charged against Plaintiff's VA home-loan entitlement, depriving Plaintiff of the use of her earned veterans' benefit.

143. Plaintiff is entitled to a declaratory judgment under 28 U.S.C. Section 2201 declaring: (a) that the loan was fraudulently originated and is void or voidable; (b) that the recorded security deed is facially defective, invalid, and unenforceable; (c) that Plaintiff shall retain title to and ownership of the Property free of the fraudulent loan and

security deed; and (d) the parties' respective rights and obligations with respect to the loan and the Property.

144. Plaintiff is further entitled to injunctive relief under 28 U.S.C. Section 2202, including an order enjoining these Defendants from foreclosing on, transferring, or further encumbering the Property, and from continuing to collect on and report the fraudulently originated loan, and directing that Plaintiff's VA home-loan entitlement be relieved of the encumbrance of the fraudulent loan.

## COUNT THIRTEEN -- Violation of 42 U.S.C. Section 1981 (Equal Right to Make and Enforce Contracts)

*(Against Tina Thornton, Barrett Financial Group, VanderMorgan Realty, Justin Bolin, Mary Yelton Realty d/b/a Boswell Realty, Max Boswell, Anne Marie Kyzer, and Katherine Nix French)*

145A. Plaintiff realleges and incorporates paragraphs 30 through 90D as though fully set forth herein.

145B. 42 U.S.C. Section 1981 guarantees to all persons within the United States the same right to make and enforce contracts, and to the full and equal benefit of all laws, as is enjoyed by white citizens.

145C. Plaintiff, an Afro American woman, was denied the same right to make and enforce her contract on equal terms. She was steered by an all-Caucasian network of professionals away from her legitimate lenders and into a fraudulent and predatory transaction; subjected to inflated income figures, a false gift letter, altered and fabricated documents, and concealed defects; and treated as less than an equal party to the transaction. The Defendants named in this Count intentionally interfered with Plaintiff's right to contract on equal terms on the basis of her race.

145D. As a direct and proximate result of these violations of 42 U.S.C. Section 1981, Plaintiff has suffered actual damages, including economic loss and severe emotional distress, and is entitled to compensatory and punitive damages.

## VI. DISCOVERY RULE AND EQUITABLE TOLLING

145. To the extent any Defendant contends that any of Plaintiff's claims is barred by a statute of limitations, any such limitations period is tolled under the discovery rule and the doctrine of fraudulent concealment.

146. Plaintiff could not have discovered the full extent of the fraud at or near the time of closing. At closing and in the months following, Plaintiff observed only surface anomalies -- a difference in the fireplace amendment and the absence of a repair receipt -- but did not possess her complete transaction file and therefore could not perceive the alterations, the fabricated signatures, the income inflation, the concealed lender, or the other wrongful conduct described above.

147. Plaintiff diligently and repeatedly sought her complete file. For approximately one year, she demanded her documents from the Defendants by email and by certified mail. The Defendants withheld her complete file: Findlay and Green did not produce it; Barrett Financial directed her to UWM; and UWM directed her back to Barrett and to the title company. To this day, Barrett Financial and UWM have never produced a single document bearing Plaintiff's name, signature, and Social Security number.

148. Plaintiff possessed a digital copy transmitted around the time of closing but had no reason to open it, believing she had received her complete contract in hard copy at closing. It was not until 2025 -- when Plaintiff finally obtained a digital copy from the closing law firm, downloaded it, and compared it against the earlier, unopened digital copy -- that she discovered the documents did not match, the front pages differed, and documents had been added or altered. That comparison was the moment Plaintiff first discovered the full extent of the fraud.

149. The Defendants' concealment of Plaintiff's own documents both prevented her discovery of the fraud and afforded the Defendants time to prepare, while Plaintiff, unable to obtain her file and unable to retain local counsel because of the Defendants' interconnection with the local legal community, proceeded pro se. A defendant who conceals the evidence of its wrongdoing cannot invoke a limitations defense premised on the delay its own concealment caused. See Ellis v. GMAC, 160 F.3d 703 (11th Cir.

1998). Any applicable limitations period was tolled until 2025, and Plaintiff's claims are timely.

## VII. FACTS SUBJECT TO DISCOVERY

Plaintiff affirmatively welcomes and does not oppose full discovery. Plaintiff is prepared to produce to the Court and to the Defendants every document, communication, text message, email, and record in her possession relating to this transaction, including her telephone and email records, because those records corroborate the allegations of this Complaint. The information Plaintiff cannot obtain without discovery -- the electronic audit trails, the complete loan file, the servicing and disbursement records, and the internal communications among the Defendants -- lies within the Defendants' exclusive control.

150. Certain facts material to the full scope of the Defendants' conduct are within the Defendants' knowledge and control, or are reflected in records Plaintiff will obtain, and are the subject of discovery, including:

(a) The identity of the person or persons who applied Plaintiff's electronic signature to documents she never knowingly signed -- including the security deed, the fireplace amendment, and the 2016 warranty deed (Burke County Book 978, Pages 235-236) -- as established by the DocuSign, AuthentiSign, and DocMagic audit trails (IP address, device, timestamp, and account) for loan number 1523172699. The signing envelopes were created and controlled through a single AuthentiSign account belonging to the buyer's broker, VanderMorgan (Justin Bolin), and the complete AuthentiSign account audit history and every DocuSign Certificate of Completion for all envelopes in this transaction are within Defendants' control and subject to production.

(b) The true ownership and transfer history of the Property immediately preceding Plaintiff's purchase. On information and belief, real estate data reflected that a person named Laura Scarff acquired the Property for approximately $20,000 to $26,000 shortly before Plaintiff's purchase for $160,000; however, Laura Scarff does not appear in the recorded chain of title. The prior ownership, prices paid, any transactions not reflected in the recorded chain of title, and any relationship between prior owners and the Defendants are matters for discovery. Plaintiff has retained dated screenshots from real estate data websites showing the Property's original appearance -- a straight brick house with mature trees, before the later addition -- and prior data that has since been removed from those sites.

(c) Whether Plaintiff's UWM-funded loan was included in the bulk mortgage-servicing-rights transfers from UWM to Mr. Cooper between January and June 2024 that are the subject of Rocket Mortgage's lawsuit against UWM, and the terms of those transfers.

(d) The referral arrangements, fees, or things of value exchanged among the Defendants; the financial relationships and any investor interests of the agents; and the complete loan file and closing accounting, including all disbursements reflected on the Closing Disclosure.

(e) The results of proper professional environmental testing of the Property for asbestos, lead, and mold hazards, given the home's 1954 construction.

(f) The four materially different versions of Plaintiff's contract produced by Mr. Cooper. The full comparison and reconciliation of these versions requires the Defendants' complete, native-format production and is not a task Plaintiff can perform manually; it is the subject of discovery.

(g) The closing firm's ALTA/settlement statement, escrow account ledger, and wire and check disbursement records for this closing, and the Citizens Mortgage payoff confirmation reflecting whether the $64,077.96 payoff shown on the seller's Closing Disclosure was in fact disbursed and the prior loan satisfied -- a payoff omitted from Plaintiff's Closing Disclosure. Plaintiff observed an ALTA settlement statement within Mr. Cooper's document production, but not within the closing attorney's package.

(h) The document identified as item 25, "Report and Certification of Loan Disbursement," on Barrett Financial's own Enclosed Documents List for the closing package, which is not present in Plaintiff's package.

## VIII. DAMAGES

151. As a direct and proximate result of the Defendants' conduct, Plaintiff has suffered, and continues to suffer, substantial damages.

152. Economic damages. Plaintiff's economic damages include the fraudulently originated $160,000 mortgage obligation on which she remains liable; the loss of the use and habitability of the Property; the cost to repair and restore the Property to safe, habitable, and code-compliant condition, as set forth below; rent of approximately $1,275 per month for alternative housing since being displaced; utility debts incurred in

connection with the transaction, including amounts owed to Georgia Power (approximately $1,000) and Duke Energy; the costs of temporary lodging in Airbnbs and hotels during displacement; storage costs; the costs of two long-distance moves, including a U-Haul rental and a surrendered North Carolina lease, over 300 miles each way; travel and fuel costs for repeated trips between North Carolina and Georgia to address this matter; the $500 earnest money; the $1,487 paid to the closing firm; the out-of-pocket costs of Plaintiff's own mold and lead testing (approximately $9.99 per kit plus approximately $14 per kit for results); and other out-of-pocket losses. The precise amounts are established by Plaintiff's records, contractor estimates, and discovery and will be proven at trial.

153. Cost of repair and restoration. Because Plaintiff seeks to retain and keep her home, she seeks the cost to repair and restore the Property to safe, habitable, and code-compliant condition, while preserving its original features. The required work includes, without limitation: full replacement of the HVAC system; remediation of the mold throughout the home; correction of the fireplace and all electrical hazards, including the exposed, corroding attic and bedroom wiring; correction and code-compliant rebuilding of the unpermitted additions, including the fourth bedroom and additional bathrooms constructed over the former exterior window; repair or replacement of the roof and correction of the attic, including insulation and ductwork; replacement of the windows, which were falsely represented as energy-efficient; repair of the plumbing and resulting water and floor damage; proper removal of the tree stumps; installation of appropriate fencing; and remediation of any asbestos and lead hazards confirmed by professional testing. Plaintiff wishes to preserve the Property's original 1954 features, including the original hardwood floors and the original main bathroom.

154. Loss of use of VA home-loan benefit. The fraudulently originated loan remains charged against Plaintiff's VA home-loan entitlement, of which Plaintiff had over $300,000 available. Plaintiff was approved for only $160,000, and, per the VA, Plaintiff cannot use her Certificate of Eligibility again unless she proves she can pay two mortgages, and then only for a reduced amount. As a result, so long as the fraudulent

loan encumbers her entitlement, Plaintiff is deprived of the use of her earned VA home-loan benefit -- a continuing harm.

155. Emotional distress and pain and suffering. The Defendants' conduct has caused Plaintiff severe emotional distress and pain and suffering. Plaintiff is a disabled veteran with PTSD that is 100% service-connected, arising from combat and military sexual trauma. The Defendants' conduct did not create Plaintiff's PTSD but severely aggravated it, adding new triggers and burdens to a chronic condition Plaintiff already manages and worsening it from moderate to chronic. This harm is documented by Plaintiff's treating providers. Plaintiff's household -- including her two adult sons and her father, himself a disabled United States Air Force veteran, amputee, and wheelchair user with diabetes, asthma, and a history of cancer -- was displaced when the Property became uninhabitable; the mold and hazardous conditions endangered her father's health and forced him to leave months before Plaintiff. Plaintiff had maintained stable housing for years; the Defendants' conduct destroyed that stability, displaced her from her home, and returned her to insecurity. Plaintiff's injuries include lasting damage to her ability to trust others generally -- not only real estate, mortgage, and legal professionals, but people in her life more broadly -- a profound loss of her sense of security, and lasting impairment of her ability and willingness to pursue homeownership. As a result of the Defendants' conduct, Plaintiff is again receiving weekly mental-health treatment through the U.S. Department of Veterans Affairs, and consents to the Court's obtaining her VA mental-health records. Plaintiff, an Afro American woman, was made to feel less than throughout a transaction conducted by an all-Caucasian network of professionals, compounding her distress.

156. Punitive damages. The Defendants' conduct was intentional, malicious, willful, and wanton, undertaken with conscious indifference to consequences, and directed at disabled veterans -- Plaintiff and her father. Such conduct, including the fabrication of Plaintiff's signature, the inflation of her income, the concealment of material and hazardous defects, and the coordinated scheme described above, warrants punitive damages to punish the Defendants and deter similar conduct, under O.C.G.A. Section 51-12-5.1 and applicable federal law.

157. Statutory and treble damages. Plaintiff is additionally entitled to the treble damages available under RICO, 18 U.S.C. Section 1964(c), and to the statutory damages available under TILA, RESPA, the FCRA, and the Fair Housing Act, as set forth in the respective Counts above.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nikki M. Harper respectfully requests that this Court enter judgment in her favor and against the Defendants, and grant the following relief:

**A. Compensatory and actual damages in an amount to be proven at trial, including Plaintiff's economic losses and out-of-pocket costs;**

**B. The cost to repair and restore the Property to safe, habitable, and code-compliant condition, as set forth above, so that Plaintiff may keep and safely occupy her home while preserving its original features;**

**C. A declaratory judgment that the loan was fraudulently originated and is void or voidable; that the recorded security deed is facially defective, invalid, and unenforceable; that Plaintiff shall retain title to and ownership of the Property free of the fraudulent loan and security deed; and declaring the parties' rights and obligations with respect to the loan and the Property;**

**D. Damages for the loss of the use of Plaintiff's VA home-loan benefit, and an order directing that Plaintiff's VA home-loan entitlement be relieved of the encumbrance of the fraudulent loan;**

**E. Damages for severe emotional distress and pain and suffering, including the aggravation of Plaintiff's service-connected PTSD (combat and military sexual trauma);**

**F. Punitive damages sufficient to punish and deter the Defendants' willful, malicious, and wanton conduct directed at a disabled Afro American veteran, including punitive damages under 42 U.S.C. Section 1981 and the Fair Housing Act, pursuant to O.C.G.A. Section 51-12-5.1 and applicable law;**

**G. Treble damages pursuant to RICO, 18 U.S.C. Section 1964(c);**

**H. Damages under the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Fair Housing Act (for race and disability discrimination), and 42 U.S.C. Section 1981, as provided by those statutes;**

**I. Injunctive relief enjoining the mortgage and servicing Defendants from foreclosing on, transferring, or further encumbering the Property, and from continuing to collect on and report the fraudulently originated loan;**

**J. An order correcting the credit reporting of the loan with all consumer reporting agencies;**

**K. All costs and expenses of this action that Plaintiff is entitled to recover as a pro se litigant, including filing fees, the costs of service occasioned by Defendants' refusal to waive service under Fed. R. Civ. P. 4(d), and postage and related litigation expenses; and attorney's fees to the extent recoverable by law or in the event Plaintiff becomes represented by counsel;**

**L. Pre-judgment and post-judgment interest as allowed by law; and**

**M. Such other and further relief as the Court deems just and proper.**

## X. JURY DEMAND

158. Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 24 day of August, 2026.

By: ______________________

Signature

Nikki M. Harper
Plaintiff Pro Se
1529 Pinebrook Court, Apartment 2
Greenville, North Carolina 27858
(762) 622-0511
harperdenece@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this 24 day of August, 2026, filed the foregoing Second Amended Complaint with the Clerk of Court, United States District Court for the Southern District of Georgia, Augusta Division, 600 James Brown Boulevard, Suite 304, Augusta, Georgia 30901, by depositing the same in the United States Mail via Priority Mail with adequate postage prepaid; and that I have served a true and correct copy of the foregoing upon all attorneys of record in this action by depositing copies in the United States Mail, first-class postage prepaid, addressed to counsel at the addresses reflected on the Court's docket.

This 24 day of August, 2026.

By: ______________________
Signature

Nikki M. Harper
Plaintiff Pro Se
1529 Pinebrook Court, Apartment 2
Greenville, North Carolina 27858
(762) 622-0511
harperdenece@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

**NIKKI M. HARPER,**
Plaintiff,
v. Civil Action No. 1:25-CV-00203-JRH-BKE
**BARRETT FINANCIAL GROUP, LLC, et al.,**
Defendants.

# PLAINTIFF'S RICO CASE STATEMENT

Plaintiff Nikki M. Harper, proceeding pro se, submits this RICO Case Statement in support of her claims under 18 U.S.C. Sections 1962(c) and 1962(d). This statement addresses the elements of Plaintiff's RICO claims and identifies the facts supporting each. Plaintiff incorporates by reference the allegations of her Second Amended Complaint.

## 1. THE UNLAWFUL CONDUCT AND SECTIONS OF RICO VIOLATED

Plaintiff alleges violations of 18 U.S.C. Section 1962(c) (conducting the affairs of an enterprise through a pattern of racketeering activity) and 18 U.S.C. Section 1962(d) (conspiracy to do so).

## 2. THE DEFENDANTS AND THEIR ROLES IN THE RACKETEERING ACTIVITY

Each Defendant, and the part each played in the enterprise, is identified below:

(a) Tina Thornton – the originator who took Plaintiff's application while unlicensed in Georgia, inflated Plaintiff's income to $4,527.50, misclassified the VA loan as FHA, and served as the hub of communication between Plaintiff, Barrett, and UWM.

(b) Barrett Financial Group, LLC -- the mortgage broker named as "Lender," which employed Thornton, transmitted the fraudulent disclosures, and ordered and paid for the appraisal.

(c) United Wholesale Mortgage – the concealed true lender that underwrote and table-funded the loan using the inflated income, and later made false statements to the CFPB regarding the appraisal assignment.

(d) VanderMorgan Realty (through agent Christina Schroder) -- Plaintiff's buyer's agent, who steered Plaintiff from her legitimate lenders and her own credit union to Thornton, concealed the defective HVAC system, and pressured Plaintiff to proceed.

(e) Justin Bolin -- broker of VanderMorgan Realty, whose single AuthentiSign account (jbolin@vandermorganrealty.com) created and controlled the electronic signing envelopes for the transaction. It was through this broker-controlled account that Plaintiff's electronic signature was applied to instruments she never knowingly signed, and through which "Signing Complete" notices were generated for documents Plaintiff was never sent for signing. Bolin thus controlled the mechanism by which Plaintiff's assent was allegedly manufactured.

(f) Mary Yelton Realty, LLC d/b/a Boswell Realty -- the listing brokerage operating under a dissolved entity.

(g) Max Boswell -- owner/broker of the listing brokerage, individually liable for conducting business under a dissolved entity.

(h) Anne Marie Kyzer -- the listing/seller's agent (License #421441), operating under the dissolved Mary Yelton Realty brand, whose signature appears on the FHA Disclosures / Real Estate Certification that certified there were no amendments to the sales contract when the transaction in fact contained altered documents.

(i) Kris Hardy d/b/a Hardy Appraisals -- the appraiser, ordered and paid by Barrett, who returned a value matching the loan amount to the dollar and falsely certified the Property's condition.

(j) All Star Home Inspections, LLC (through inspector Dwayne Higdon) -- retained by Christina Schroder (not by Plaintiff), performed the inadequate inspection that failed to disclose the Property's defects; no mold testing was ordered for Plaintiff. All Star is well known in the region to work closely with VanderMorgan Realty and was financially affiliated with the selling side.

(k) Chuck Tolbert -- owner of All Star Home Inspections and an affiliate/sponsor of the local realtor association.

(l) Findlay, Edenfield & Green, LLC and Mark Green -- the closing firm and attorney who suppressed Plaintiff's documents, delivered and recorded a defective security deed, and withheld Plaintiff's file.

(m) Danielle Neef -- closer who falsely attested as "unofficial witness" on the security deed.

(n) Steven Sikes -- generated false repair documentation representing that required repairs were completed.

(o) Katherine Nix French -- the seller, who concealed the Property's known defects and sold it through the altered documents.

(p) Mr. Cooper / Nationstar Mortgage -- the post-closing loan servicer/holder that received and continued servicing the allegedly fraudulently originated loan after Plaintiff reported the underlying fraud and document irregularities; its internal fraud investigation allegedly identified a credible collusion concern, yet servicing, collection, credit reporting, and foreclosure activity continued. Mr. Cooper's conduct is alleged as part of the continuing pattern of racketeering activity following the fraudulent origination.

(q) Lakeview Loan Servicing -- a servicing/loan-related entity to which the reported fraud findings were transmitted and which remained involved in the servicing/enforcement chain. Plaintiff alleges that Lakeview continued to treat and enforce the loan as valid despite notice of the alleged origination fraud and document defects, as part of the continuing post-closing conduct alleged in the Complaint.

### 3. THE VICTIM

The victim of the racketeering activity is Plaintiff, Nikki M. Harper, a disabled United States Army veteran using her VA home-loan benefit for the first time.

### 4. THE PREDICATE ACTS (RACKETEERING ACTIVITY)

The predicate acts are wire fraud (18 U.S.C. Section 1343) and mail fraud (18 U.S.C. Section 1341). Because Plaintiff resided in North Carolina while the transaction was conducted from Georgia, Arizona, Nevada, and Michigan, the documents and communications were transmitted by interstate wire and mail. Each predicate act is identified below with the who, what, when, where, and how:

(a) Steering communications (interstate wire). On November 28, 2023, Christina Schroder (VanderMorgan), from Georgia, transmitted to Plaintiff in North Carolina

electronic messages disparaging Veterans United and soliciting Plaintiff to Tina Thornton as a "VA magician," for the purpose of steering Plaintiff off her legitimate financing and into the fraudulent loan.

(b) Inflated-income disclosures (interstate wire). In December 2023, Thornton and Barrett transmitted to Plaintiff, and caused to be transmitted to UWM, loan documents and disclosures reflecting a false "Verified Income" of $4,527.50, when Plaintiff's true income was approximately $3,595.95 to $3,737.85, for the purpose of manufacturing loan eligibility.

(c) Concealed-lender communications (interstate wire). On December 11, 2023, "Chris Cooper," on Barrett letterhead, emailed Plaintiff (copying Trevor Barrett and Tina Thornton) representing Thornton as Plaintiff's loan officer and stating disclosures would come from UWM, while the closing documents named Barrett as "Lender," concealing UWM as the true lender.

(d) FHA misclassification (interstate wire). On December 22, 2023, Thornton transmitted an email treating Plaintiff's VA loan as an FHA loan, and the file substituted an FHA Amendatory Clause for the mandatory VA escape clause, stripping Plaintiff's VA protections.

(e) Fabricated electronic signatures (interstate wire). On or about December 11, 2023, and thereafter, Plaintiff's electronic signature was applied -- through the DocuSign, AuthentiSign, and DocMagic platforms -- to documents Plaintiff never knowingly signed, including the FHA Amendatory Clause (time-stamped in Pacific Time while Plaintiff was in Eastern-Time North Carolina), the altered fireplace amendment (on which Plaintiff's signature, unlike the other parties', bears no platform capture identifier), and a prior 2016 warranty deed conveying the Property between other parties (Burke County Book 978, Pages 235-236) to which Plaintiff was never a party. The signing envelopes for the transaction were created and controlled through a single AuthentiSign account belonging to the buyer's broker, VanderMorgan (Justin Bolin), and "Signing Complete" notices were generated for documents for which no signing invitation was sent to Plaintiff -- reflecting that the electronic execution of Plaintiff's signature was controlled by the enterprise rather than by Plaintiff.

(f) The broker-ordered appraisal (interstate wire and mail). In December 2023, Barrett ordered and later paid for the appraisal by Kris Hardy (Invoice No. 762-23; check no. 20041, January 12, 2024), who returned a value of exactly $160,000 -- matching the loan amount -- and falsely certified the Property's condition; UWM later represented to the CFPB that the VA had assigned the appraiser, contradicting Hardy's own invoice.

(g) The compromised closing, conflicting disclosures, and defective deed (interstate wire and mail). On and after January 9, 2024, the closing Defendants suppressed Plaintiff's VA documents and transmitted the security deed to Plaintiff two days after closing. Two Closing Disclosures for the single transaction do not reconcile: Plaintiff's copy reports Cash to Seller of $143,903.08 with a blank first-mortgage-payoff line, while the seller's copy reports Cash to Seller of $74,475.47 and a $64,077.96 payoff to Citizens Mortgage -- a $69,427.61 difference, omitting from Plaintiff's disclosure a payoff required to convey clear title. The security deed, generated through DocMagic and barcoded on all pages, bears an undated purported signature of Plaintiff, a notary block naming two different counties (Richmond seal, Burke printed line), and exists in more than one non-matching version.

(h) Concealment of Plaintiff's file (interstate wire and mail). For approximately one year following closing, the Defendants withheld Plaintiff's complete file in response to her repeated email and certified-mail demands, concealing the fraud.

(i) Continued collection and false credit reporting (interstate wire and mail). Following the fraudulent origination, Mr. Cooper / Nationstar and Lakeview, as servicing/loan-related Defendants, continued to treat and enforce the loan as valid after receiving notice of Plaintiff's fraud allegations and document irregularities. The servicing Defendants continued collection activity, reported the loan to the credit bureaus in irreconcilable ways, and participated in foreclosure activity that was later halted. These acts were carried out through interstate communications and are alleged as continuing acts in furtherance of the enterprise's objective.

**5. THE PATTERN OF RACKETEERING ACTIVITY**

The predicate acts are related and continuous. They are related because they shared: the same purpose (to induce Plaintiff to close on and remain bound to the fraudulent VA

loan and to profit from it); the same victim (Plaintiff); the same participants acting in coordinated, interlocking roles; and the same methods (misrepresentation, concealment, document fabrication, and interstate wire and mail communications). They are continuous because they began in November 2023 and have continued without interruption -- through the fabrication and recording of documents, the year-long concealment of Plaintiff's file, the transfer and servicing of the loan, the scheduled-then-abandoned foreclosure, the ongoing false credit reporting, and the continuing collection on the loan -- to the present day. The scheme is open-ended and continues to injure Plaintiff.

## 6. THE ENTERPRISE

The enterprise is an association-in-fact within 18 U.S.C. Section 1961(4), consisting of the Defendants identified in Section 2 above. It is an ongoing organization, formal or informal, whose members functioned as a continuing unit for the common purpose of originating, closing, servicing, enforcing, and profiting from Plaintiff's VA-backed home purchase through fraud. The enterprise had a structure and division of labor: the buyer's agent steered; the originator and broker inflated income and misclassified the loan; the true lender funded while concealed; the appraiser supplied a value to match the loan; the inspector concealed defects; the seller and listing agents concealed defects and executed false certifications; the closing firm suppressed documents and recorded a defective deed; and, after closing, the servicing/loan-related Defendants continued collection, credit reporting, and enforcement activity after notice of the alleged fraud. The enterprise exists separate and apart from the pattern of racketeering activity.

## 7. THE RELATIONSHIP BETWEEN THE ENTERPRISE AND THE PATTERN

Each Defendant was employed by or associated with the enterprise and participated in the conduct of its affairs through the pattern of racketeering activity described above. The enterprise's common purpose was accomplished through the predicate acts, and the predicate acts were committed to further the enterprise's objective of profiting from the fraudulent transaction.

## 8. INTERSTATE COMMERCE

The enterprise engaged in and affected interstate commerce. The origination involved Arizona (Barrett), Nevada (Thornton's operations), and Michigan (UWM); the Property and closing were in Georgia; and Plaintiff resided in North Carolina, to which the fraudulent documents were transmitted for signature. The resulting mortgage was sold and serviced across state lines.

**9. INJURY TO BUSINESS OR PROPERTY**

Plaintiff was injured in her property by reason of the racketeering activity. Her injuries include the fraudulently originated $160,000 mortgage obligation on which she remains liable; the loss of the use and habitability of the Property; the encumbrance of her VA home-loan entitlement (of which she had over $300,000 available); and her out-of-pocket financial losses. These injuries were directly and proximately caused by the predicate acts, which induced Plaintiff to close on and remain bound to the fraudulent loan.

10\. THE CONSPIRACY (18 U.S.C. Section 1962(d))

The Defendants identified in Section 2 above conspired to violate Section 1962(c). The agreement is shown by the coordinated, interlocking nature of their conduct, in which the transaction participants performed assigned roles in the scheme and the post-closing servicing/loan-related Defendants continued the enterprise's objective after receiving notice of the alleged fraud. The coordinated conduct included steering, income inflation, loan misclassification, concealed funding, the matched appraisal, the concealed inspection, false certifications, the controlled electronic-signature process, the compromised closing, continued collection, false credit reporting, and foreclosure activity. Plaintiff alleges that these acts reflected a common understanding and design rather than independent action and that each Defendant knowingly agreed to further the enterprise's objective and committed overt acts in furtherance of it.

**11. DAMAGES**

Plaintiff seeks treble damages under 18 U.S.C. Section 1964(c), together with the costs of this action, and such other relief as set forth in the Second Amended Complaint.

Respectfully submitted this 24 day of August, 2026.

By: ______________________
Signature
Nikki M. Harper
Plaintiff Pro Se
1529 Pinebrook Court, Apartment 2
Greenville, North Carolina 27858
(762) 622-0511
harperdenece@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this 24 day of August, 2026, filed the foregoing Plaintiff's RICO Case Statement with the Clerk of Court, United States District Court for the Southern District of Georgia, Augusta Division, 600 James Brown Boulevard, Suite 304, Augusta, Georgia 30901, by depositing the same in the United States Mail via Priority Mail with adequate postage prepaid; and that I have served a true and correct copy of the foregoing upon all attorneys of record in this action by depositing copies in the United States Mail, first-class postage prepaid, addressed to counsel at the addresses reflected on the Court's docket.

This 24 day of August, 2026.

By: ______________________
Signature
Nikki M. Harper
Plaintiff Pro Se
1529 Pinebrook Court, Apartment 2
Greenville, North Carolina 27858
(762) 622-0511
harperdenece@gmail.com

Visit U
Appl
Wi
Use th...
or inkjet printer

...ode to
...a pickup

**...hipments**
...r the letter rate, UPS Express® envel...
...ence, urgent documents, and/or elec...
. UPS Express envelopes containing it...
...more than 8oz. will be billed by weig...

**...al Shipments**
...ress envelope may be used only for...
In countries consider electronic medi...
...portexport to verify if your shipment...

...r the letter rate, the UPS Express enve...
...s envelopes weighing more than 8 oz.

...xpress envelopes are not recommend...
...dia containing sensitive personal infor...
...cash or cash equivalent.

SOUTHERN DISTRICT OF GEORGIA -
600 JAMES BROWN BLVD
AUGUSTA GA 30901

P: NATL S: OUT
58F - 4680
1ZR9208V029906 0639
AUG 26 04:18:26 2026

NIKKI HARPER
2526896920
2120 E. FIRE TOWER RD #107
GREENVILLE NC 27858

1 LBS
DWT:

SHIP TO:
CLERK OF COURT - UNITED STATES DI...
2529993774
SOUTHERN DISTRICT OF GEORGIA - AUGU
600 JAMES BROWN BLVD
AUGUSTA GA 30901-2332

GA 309 0-01

UPS 2ND DAY AIR 2
TRACKING #: 1Z R92 08V 02 9906 0639

BILLING: P/P

Trx Ref No.: PM PKG ID 397434
Trx Ref No.: FROM Nikki Harper
XOL 26.06.01 NV45 36.0A 08/2026

UPS Next Day Air®
UPS Worldwide Express®
UPS 2nd Day Air®
UPS Worldwide Expedited®
UPS Ground
UPS Standard
UPS 3 Day Select®

Serving you for more than 110 years
United Parcel Service.®

Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established ...ntion for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

For information about UPS's privacy practices or to opt out from the sale of personal information, please see the UPS Privacy Notice at www.ups.com
010195103 5/21 PAC United Parcel Service