U.S. DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

SEP 23 2026

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| **NIKKI M. HARPER,**<br>Plaintiff,<br><br>v.<br><br>**BARRETT FINANCIAL GROUP, LLC, *et al.*,**<br>Defendants. | Civil Action No.<br><br>1:25-CV-00203-JRH-BKE |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT BARRETT FINANCIAL GROUP, LLC'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Plaintiff Nikki M. Harper, a United States Army war veteran rated 100% permanently and totally disabled by the U.S. Department of Veterans Affairs for service-connected post-traumatic stress disorder (PTSD), proceeding pro se, respectfully submits this response in opposition to Defendant Barrett Financial Group, LLC's motion to dismiss her Second Amended Complaint.

**STANDARD OF REVIEW**

On a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint survives if it pleads facts that state a claim to relief that is plausible on its face.

Because Plaintiff proceeds pro se, her pleadings are held to less stringent standards than those drafted by attorneys and must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

Critically, at this stage Plaintiff is not required to prove anything. She need not marshal evidence, prove her allegations, or persuade the Court of the merits; she need only allege facts that, taken as true, state a plausible claim. Disputed questions of fact are for discovery and trial, not for resolution on a motion to dismiss.

## IV. RESPONSE TO DEFENDANT BARRETT FINANCIAL GROUP, LLC

Barrett Financial Group, LLC was properly served and is before the Court. (See Proof of Service, served on Barrett's authorized agent in Tempe, Arizona, April 13, 2026.) Barrett moves to dismiss every claim against it. Its motion should be denied. Barrett's own compliance officer, in written correspondence responding to Plaintiff's demands, has confirmed that Barrett acted "as the mortgage broker" in this transaction — not as the lender. That written admission by Barrett's own compliance officer contradicts the central premise of several of Barrett's arguments and confirms that the facts Barrett now disputes are, at a minimum, genuinely contested. And Barrett asks the Court to fault Plaintiff for failing to plead facts contained in the origination contract while Barrett continues to withhold that very contract from her. (SAC ¶¶ 81, 150(h).)

### *A. The Concealed-Lender Allegations Are Pleaded and, at Minimum, Present a Factual Dispute.*

Barrett argues that Plaintiff did not adequately plead that Barrett's designation as "Lender" was false. She did. The SAC alleges that Barrett is a mortgage broker (SAC ¶ 7); that Barrett was nonetheless designated "Lender" on the Closing Disclosure and related federally required documents (SAC ¶ 105(a)); and that United Wholesale Mortgage was the actual creditor and table-funding lender, which "performed the underwriting review" of the loan

(SAC ¶¶ 9, 105(a)). Barrett's own compliance officer has confirmed in writing that Barrett acted as the mortgage broker, and UWM has itself admitted that it performed the underwriting. A mortgage broker is not the creditor. Whether the "Lender" designation was false is therefore, at a minimum, a disputed question of fact that cannot be resolved on a motion to dismiss. Plaintiff further alleges that she was not told UWM was her lender and did not discover it until her first payment came due in February 2024, and that the documents identifying UWM appeared in the files of the servicer and closing attorney but not in her own copy. (SAC ¶¶ 47, 81.) These allegations, taken as true, plausibly establish the concealment Plaintiff alleges. Indeed, the transaction documents give three different answers to the single question of who Plaintiff's lender was: the Closing Disclosure names Barrett as "Lender"; Barrett told the Arizona regulator it acted only "as the mortgage broker" and that the loan was approved by "the lender's underwriting department"; and UWM stated it merely "purchased" the loan after closing — a claim its own approval letter contradicts, because that letter shows UWM underwriters assigned to the file, a submission date weeks before closing, and UWM closing conditions providing that "if changes are required[,] loan must be returned to UWM for approval." UWM was underwriting and setting the loan's conditions before closing, not merely purchasing it afterward. That the parties themselves cannot give a single, consistent answer to who the lender was is the clearest confirmation that the question is disputed and unsuited to resolution on the pleadings. Moreover, the Security Deed securing Plaintiff's loan is a matter of public record, recorded in the real property records of Burke County, Georgia, of which the Court may take judicial notice without converting this motion to one for summary judgment. That recorded instrument names Barrett as "Lender" on its face, directly contradicting Barrett's representation to the Arizona Department of Insurance and Financial Institutions that it acted only "as the mortgage broker."

The Closing Disclosure also violated TILA's delivery-timing requirement. Regulation Z requires that the consumer receive the Closing Disclosure at least three business days before

consummation. 12 C.F.R. § 1026.19(f)(1)(ii)(A). Plaintiff's buyer's Closing Disclosure bears a "date issued" of January 8, 2024, for a January 9, 2024 closing, and Plaintiff first received and signed it — in wet ink — at the closing table on January 9, 2024. (SAC ¶¶ 77, 80A.) A Closing Disclosure issued one day before consummation, and first delivered to the borrower at the table, does not satisfy the three-business-day requirement. Compounding the defect, the two Closing Disclosures generated for this single transaction do not reconcile: Plaintiff's copy reports Cash to Seller of $143,903.08 and leaves the payoff line blank, while the seller's copy reports $74,475.47 and accounts for a $64,077.96 payoff and a $10,951.11 seller credit — a difference of $69,427.61. (SAC ¶ 80A.) These are TILA violations pleaded in the SAC and supported by the Defendants' own documents.

The documents in Plaintiff's closing package uniformly identify Barrett as her "Lender" — the First Payment Letter directing payment to Barrett, the Appraisal Disclaimer, the Borrower Consent to Use of Tax Return Information, the Notice Concerning Furnishing of Negative Information, the promissory Note, and the Security Deed. Yet the closing instructions in the same file were generated on United Wholesale Mortgage's forms, directed the executed package to the UWM Settlement Agent Portal, required a UWM Borrower Attestation (Form 1220), and ordered Plaintiff's signed Note overnighted to a warehouse bank, Simmons Bank, within twenty-four hours — already endorsed to UWM — with final recorded documents returned to UWM. The Note itself, made payable to Barrett, bears an endorsement "pay to the order of United Wholesale Mortgage, LLC, without recourse" — on which the signature line ("by ____, name and title") is blank and unsigned. The Security Deed names Barrett as "Lender" on its face while directing that it be returned to UWM. Plaintiff does not contend that warehouse funding or the sale of a loan to a wholesale investor is itself unlawful; her allegation is that she was told, on every document placed before her, that Barrett was her lender, while the true creditor was concealed. Whether Barrett was Plaintiff's creditor, whether the Note was properly negotiated to UWM, and who holds the right to enforce the loan are disputed

questions of fact for discovery, not for resolution on the pleadings.

*B. The RICO Counts (One and Two) Plead a Pattern and Continuity, or Warrant Leave To Amend.*

Barrett contends that the SAC describes a single transaction that cannot constitute a RICO pattern. But the SAC pleads that the predicate acts are both related and continuous. (SAC ¶ 96A.) It alleges relatedness through a shared purpose, victim, and set of participants (SAC ¶¶ 96, 96A), and it alleges continuing conduct extending well beyond the January 2024 closing — including the year-long concealment of Plaintiff's documents, the transfer and servicing of the fraudulently originated loan, the threatened foreclosure, and the continued collection on the loan. (SAC ¶¶ 96A, 142.) Barrett does not challenge the particularity of the predicate acts or that they are related; it disputes only continuity. Count Two (Section 1962(d)) rises with Count One; the SAC pleads a knowing agreement among the Defendants to conduct the enterprise's affairs (SAC ¶¶ 99–101), which is sufficient at the pleading stage.

*C. The TILA Claim (Count Three) Is Timely: a Three-Year Limitations Period Governs the Originator-Licensing Violation, and the Concealment Is Ongoing.*

Barrett argues that Plaintiff's TILA claim is time-barred. It is not. The SAC alleges that Defendants concealed the TILA violations by withholding Plaintiff's complete loan file for approximately one year, such that she could not have discovered them at closing, and that the limitations period is tolled under the discovery rule and the doctrine of equitable tolling. (SAC ¶¶ 106, 145–149.) Critically, the concealment is not merely past — it is ongoing. Barrett has never produced Plaintiff's complete origination contract, despite her repeated demands by email and certified mail; Barrett's compliance officer responded to those demands by representing that the documentation had already been provided, when it had not. (SAC ¶¶ 81, 147, 150(h).) A plaintiff cannot be charged with discovering disclosure violations contained in a document the defendant continues to withhold. Copies Plaintiff later obtained from third parties — the servicer and the closing attorney — are not Barrett's origination file and do not

cure Barrett's continuing refusal to produce its own records. At a minimum, whether Plaintiff's claims are timely turns on when she reasonably could have discovered the violations, which is a fact question unsuited to resolution on the pleadings.

Independent of the tolling set out above, Barrett's limitations argument fails for a further reason: the loan-originator violations at the heart of this case are governed by a three-year limitations period, not the one-year period Barrett invokes. TILA generally requires that a private action be brought within one year of the violation, but it expressly provides that an action with respect to any violation of 15 U.S.C. § 1639b may be brought before the end of the three-year period beginning on the date the violation occurred. 15 U.S.C. § 1640(e). Section 1639b and its implementing regulation require that a residential mortgage loan originator be properly licensed and registered, 12 C.F.R. § 1026.36(f), and that each loan document bear the name and NMLSR identification number of the loan originator organization and of the individual loan originator with primary responsibility for the origination, id. § 1026.36(g). Plaintiff's loan closed on January 9, 2024, and this action was filed in 2025 — well within three years. A TILA claim arising from these origination-licensing and originator-identification requirements is therefore timely on its face, independent of any tolling.

The facts establishing that violation are already pleaded and are, in any event, subject to judicial notice. The SAC alleges that Tina Thornton was the individual who actually originated Plaintiff's loan — taking the application, collecting the income documentation, obtaining the Certificate of Eligibility, and serving as Plaintiff's sole point of contact throughout — and that Thornton was not licensed to originate mortgage loans in the State of Georgia at the time of Plaintiff's Georgia loan. (SAC ¶¶ 8, 47–48.) The public NMLS licensing records establishing Thornton's Georgia licensing status were previously filed by Plaintiff in this action (SAC ¶ 48), and the NMLS registry is a government-maintained record of which the Court may take judicial notice without converting this motion into one for summary judgment.

Those records show that Thornton's Georgia mortgage loan originator license did not issue until January 15, 2026 — more than two years after Plaintiff's closing — and that her federal registrations reflect a gap covering the entire origination period, during which she held no active federal registration. On the loan documents, however — including the security deed — the name and NMLSR identification number placed in the originator field were not Thornton's but those of Trevor Barrett, a person with whom Plaintiff never spoke and who performed none of the origination work; the substitution was made on December 11, 2023, the same day the disputed FHA Amendatory Clause was generated, and Thornton continued to work the loan afterward. Substituting a licensed individual's name in the originator field for that of the unlicensed individual who actually performed the origination is the precise circumstance § 1026.36(f) and (g) are directed against, and it corroborates rather than dispels the concealment Plaintiff alleges.

Nor can Barrett characterize this as a harmless or clerical irregularity. As of Plaintiff's closing, Barrett was already subject to a Connecticut Department of Banking consent order — entered August 7, 2023 and signed by Trevor Barrett as Barrett's managing member — concerning Barrett's failure to keep its NMLS filings current; that order is a public agency record of which the Court may take judicial notice. An entity already operating under a regulatory order about the accuracy of its NMLS filings cannot plausibly claim that the misidentification of the originator on a federally required loan document was an innocent oversight. To the extent the Court concludes that Count Three does not already encompass this § 1639b origination-licensing and originator-identification violation, the facts supporting it are already pleaded at SAC ¶¶ 8 and 47–48 and further established by public records subject to judicial notice.

*D. The RESPA Claim (Count Four).*

Plaintiff's RESPA servicing allegations under 12 U.S.C. § 2605 concern the conduct of the loan servicer, not Barrett, and Plaintiff does not press the Section 2605 servicing theory against Barrett. Plaintiff's Section 2607 anti-referral allegations, however, are pleaded against the origination-side Defendants, including Barrett (SAC ¶ 109), and the existence and amount of any fee, kickback, or thing of value exchanged for the referral of settlement services is information within Defendants' possession and control and is the proper subject of discovery (SAC ¶ 150(d)).

*E. The Fair Housing Act Claim (Count Six) Is Adequately Pleaded on a Disability Theory.*

Plaintiff is a person with a disability within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h). (SAC ¶ 117.) The SAC alleges that from Plaintiff's first communication, every Defendant named in this Count knew she was a disabled veteran using her VA benefit and VA disability income, and that these Defendants discriminated against her on the basis of disability by exploiting her disability income and stripping the disability-related protections to which she was entitled. (SAC ¶ 118.) Specifically as to the loan, Plaintiff alleges that her VA loan was misclassified and treated as an FHA loan, and that the mandatory, non-waivable VA escape clause required by 38 C.F.R. § 36.4303(k)(4) was replaced with an FHA document she did not knowingly sign. (SAC ¶¶ 53–55.) Those allegations state a plausible disability-discrimination claim. Plaintiff acknowledges that 42 U.S.C. § 3613(c)(1) authorizes actual and punitive damages, and not "statutory" damages, and to that limited extent Plaintiff does not seek statutory damages under the FHA. The race and steering allegations are principally directed at the brokerage Defendants. (SAC ¶ 145C.)

*F. The VA-Specific Violations Are Documented on the Face of the Loan File.*

Plaintiff's loan was a VA-guaranteed loan, and the federal rules governing such loans exist to protect the veteran borrower. Two violations appear on the face of the loan documents. First, the mandatory VA escape clause required by 38 C.F.R. § 36.4303(k)(4) — which

protects a veteran where the purchase price exceeds the VA's reasonable value and which cannot be waived — was not provided; in its place appeared an FHA Amendatory Clause on a VA loan, a document Plaintiff disputes signing. (SAC ¶¶ 53–55.) Second, on a VA loan a lender may charge a flat origination fee not exceeding one percent of the loan amount, and that flat charge is "in lieu of all other charges relating to costs of origination not expressly specified" in the VA schedule. 38 C.F.R. § 36.4313(d)(2). The lender must certify it has imposed no charges in excess of those permitted, id. § 36.4313(a), and brokerage charges may not be made against the veteran for obtaining the guaranty, id. § 36.4313(c). Here, the origination-cost fees charged to Plaintiff — a processing fee of $500, an underwriting fee of $1,055, and an administration fee of $595, totaling $2,150 — exceed the one-percent cap of $1,600 on her $160,000 loan, and were charged by Barrett, a mortgage broker. In addition, Plaintiff's loan closed at an interest rate of 7.749% when the average 30-year VA rate on the closing date was approximately 6.12%, and Plaintiff was separately charged discount points — which are ordinarily paid to reduce the interest rate — yet still received a rate more than one and a half percentage points above market. The reason for the above-market rate and the compensation Barrett received from UWM in connection with it are matters within Defendants' control and the subject of discovery. These are not conclusory allegations; they are computations from the loan documents themselves, and they state plausible violations of the VA rules governing Plaintiff's loan.

*G. The Fraud, Negligent-Misrepresentation, and Breach Claims (Counts Seven, Eight, and Nine) Plead Causation and Reliance.*

Barrett does not dispute that the income inflation was pleaded with particularity; it disputes causation and reliance. Both are pleaded. The SAC alleges that Thornton and Barrett misrepresented Plaintiff's income as $4,527.50 when they possessed her true income documentation showing approximately $3,595.95 to $3,737.85, and that this inflation manufactured an eligibility Plaintiff did not possess — weeks earlier, on her true income, she

had been denied. (SAC ¶¶ 50–52, 121(a).) That is but-for causation: without the inflated income, the loan does not qualify, does not close, and the injuries that flowed from it do not occur.

The documents Defendants themselves produced to Plaintiff establish the point. The loan application (Form 1003) lists "$4,527.00 per month" as Plaintiff's actual monthly income, and the UWM Loan Approval Conditions label "$4,527.50" as "Verified Income." Plaintiff's actual VA benefit at the time, reflected in her bank records, was approximately $3,711.85 per month. This is not a case of a lender transparently "grossing up" non-taxable income for qualifying purposes and disclosing it as such: a figure Plaintiff never received was entered in the income field itself as her actual monthly income and then represented as "verified." The qualifying ratios were built on that figure — the housing and total debt-to-income ratios of 33.72% and 50.82% shown on the approval letter tie exactly to the $4,527.50 figure — while on Plaintiff's true income the total debt-to-income ratio exceeds 60%, well outside qualifying limits. Because these documents were produced to Plaintiff by Defendants themselves, Defendants cannot dispute their content at the pleading stage. As to reliance, the SAC alleges that Plaintiff was a first-time buyer who expressly told these Defendants she was relying on them and had no independent means to know that her income had been inflated or her loan misclassified. (SAC ¶¶ 123, 123A.) Barrett's contrary position — that it merely submitted borrower-provided information without modification — is contradicted by the allegation that Plaintiff's true income documentation was in Defendants' possession and that the figure submitted did not match it. That conflict is a factual dispute that cannot be resolved on a motion to dismiss.

*H. The Civil Conspiracy Claim (Count Eleven).*

The SAC alleges that the Defendants acted in concert, pursuant to a common design, to induce Plaintiff to close on the fraudulent loan, and that they committed overt tortious acts in

furtherance of that design, whose interlocking roles reflect coordination rather than independent conduct. (SAC ¶¶ 137–138.) An agreement may be inferred from conduct, and the coordinated, interlocking acts alleged here support that inference. The conspiracy claim rises with the underlying torts; because those torts are adequately pleaded, so is the conspiracy.

*I. Declaratory and Injunctive Relief (Count Twelve).*

An actual, justiciable controversy exists concerning the validity and enforceability of the loan and the security instrument. (SAC ¶ 141.) The loan and the recorded security deed remain active; the servicing Defendants continue to treat them as valid and to collect on the loan; and Plaintiff's VA home-loan entitlement remains encumbered by the fraudulently originated loan. (SAC ¶¶ 142, 154.) Plaintiff seeks a declaration that the loan is void or voidable and injunctive relief concerning its enforcement. (SAC ¶¶ 143–144.) That is a live controversy sufficient to support declaratory relief. To the extent the Court concludes that prospective injunctive relief is unavailable against Barrett specifically, any such dismissal should be without prejudice, as it would not reach Plaintiff's claims for damages.

*J. The Section 1981 Claim (Count Thirteen).*

Plaintiff, an Afro-American woman, alleges that she was denied the same right to make and enforce her contract on equal terms, having been steered by an all-Caucasian network of professionals away from her legitimate lenders and into a predatory transaction, and treated as less than an equally-situated buyer. (SAC ¶ 145C.) Those allegations, taken as true, state a claim under Section 1981; the intentional-discrimination and but-for-causation elements are pleaded through the steering carried out by the all-Caucasian network of which Barrett was a part.

For these reasons, Barrett's motion should be denied. Barrett's detailed, count-by-count motion confirms that the SAC gave it fair notice of the claims against it; its arguments raise factual disputes that cannot be resolved on the pleadings; and it seeks dismissal of claims

whose supporting facts it continues to withhold. To the extent the Court finds any claim against Barrett insufficiently pleaded, Plaintiff respectfully requests leave to amend rather than dismissal with prejudice.

## CERTIFICATE OF SERVICE

I hereby certify that I have this 21 day of September 2026, filed the foregoing Plaintiff's Response in Opposition to Defendant Barrett Financial Group, LLC's Motion to Dismiss with the Clerk of Court, United States District Court for the Southern District of Georgia, Augusta Division, 600 James Brown Boulevard, Suite 304, Augusta, Georgia 30901, by depositing the same in the United States Mail via Priority Mail with adequate postage prepaid; and that I have served a true and correct copy of the foregoing upon all attorneys of record in this action by depositing copies in the United States Mail, first-class postage prepaid, addressed to counsel at the addresses reflected on the Court's docket.

This 21 day of September, 2026.

By: [signature]
Signature
Nikki M. Harper
Plaintiff Pro Se
1529 Pinebrook Court, Apartment 2
Greenville, North Carolina 27858
(762) 622-0511
harperdenece@gmail.com

PRESS FIRMLY TO SEAL

FSC MIX Board FSC™ C106260

PAPER POUCH how2recycle.info

PRESS FIRMLY TO SEAL

PRIORITY MAIL EXPRESS
FLAT RATE ENVELOPE
POSTAGE REQUIRED

# PRIORITY MAIL EXPRESS®

FOR DOMESTIC A
PLACE MA

US POSTAGE AND FEES PAID
PM EXPRESS IMI
Sep 21 2026
Mailed from ZIP 27858
PME
ZONE 4 FLAT-RATE ENV
10580954
Commercial

E

endicia
06380011486629

## PRIORITY MAIL EXPRESS 1-DAY

Nikki Harper
1529 PINEBROOK CT APT 2
GREENVILLE NC 27858

C065 0007

Shipped using PostalMate
Pkg:401406

- Guaranteed delive
- Guaranteed delive
- USPS Tracking® s
  and many internat
- Pick up available.
- Domestic shipmer
  (restrictions apply
- Signature include

## LAT RATE NVELOPE

NE RATE ■ ANY WEIGHT

NO SUNDAY OR HOLIDAY DELIVERY
SIGNATURE REQUIRED

SHIP TO: Southern District of Georgia - Augusta Div.
Clerk of Court - United States District Court
600 James Brown Blvd
AUGUSTA GA 30901

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

PS10001000006

*Money Back Guarantee to
select International destin
See DMM and IMM at *pe.*

**Insurance does not cover
claims exclusions see the
*http://pe.usps.com.*

+Money Back Guarantee fo

WHEN USED INTERNATIONALLY, A

USPS SIGNATURE TRACKING #

9481 7508 9956 1000 4638 05

EP13F October 2023
OD: 12 1/2 x 9 1/2

PAPER POUCH how2recycle.info

SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

UNITED STATES POSTAL SERVICE®